# CHARLESTON

## TOLLEY *v.* POTEET *et al.*

### Submitted February 7, 1907.   Decided May 22, 1907.

1. WILLS—*Rights of Devisees and Legatees—Election—Necessity.*

    One entitled to any benefit under a will or other instrument must, if he claims that benefit, abandon every right and interest the assertion of which would defeat even partially any of the provisions of that instrument.   (p. 245.)

2. SAME.

    Where land conveyed to husband and wife jointly is devised by him in severalty in different parts to his children, one portion thereof being devised to his wife for life with remainder to two daughters, and there is also devised to the wife other property, all of which she accepts in ignorance of such joint title in the land, she is thereafter estopped from asserting any other interest in the land than that so devised to her, unless upon obtaining information of such joint interest she renounces the will and surrenders all interests acquired thereby.   (p. 245.)

3. SAME— *Mistake as to Facts.*

    When, however, one is required to make such an election he is entitled to know all the facts and circumstances affecting his choice and to inquire into and ascertain all the circumstances: and, if the election has been made in ignorance or under a mistake as to the real nature of the properties, or as to the nature of his own rights, such a mistake is regarded as one of fact rather than of law, and a court of equity will permit the election to be revoked, unless the rights of third persons have intervened which would be interfered with by the revocation.   (p. 246.)

4. JUDGMENT—*Res Judicata—Partition.*

    Where by decree of a court of competent jurisdiction land of one

devisee is upon his death intestate partitioned to his heirs, another devisee holding under the same will who is a co-partitioner under such decree can not thereafter assert against his co-partitioners any greater interest in the land partitioned than that conferred upon him thereby.   (p. 246.)

5. DEEDS — *Validity—Estoppel or Waiver as to Defects.*

A deed for land obtained from a person who is old and infirm but has mental capacity sufficient to make a deed, through fraud and concealment of material facts known to the grantee respecting the effect of the deed and the nature of the title sought, will be set aside at the suit of the one thus defrauded, although part of the interest thus acquired is subsequently reconveyed and is accepted by her still ignorant of the facts relating to her title and the effect of such prior and subsequent deed.   (p. 247.)

6. CANCELLATION OF INSTRUMENTS—*Relief Granted.*

Where in such fraudulent transaction the grantor is induced to believe that he is executing an option contract with the person acting as agent of the fraudulent grantee, and to part with substantial interests of property in addition to those covered by such contract, but proposes to perfect in the grantee such title as by said contract was agreed to be given, the fraudulent deed will be set aside upon repayment of the purchase money, unless the fraudulent grantee reconvey all interests in the land except such as the grantor agreed in said contract to convey.   (p. 247.)

7. FRAUD—*Misrepresentation.*

Fraud in the procurement of a contract avoids it: and where a party intentionally or by design misrepresents a material fact or produces a false impression, in order to mislead another or to entrap or cheat him or to obtain an undue advantage over him, in every such case there is positive fraud in the truest sense of the term—there is an evil act with an evil intent; and the misrepresentation may be as well by deeds and acts as by words, by artifices to mislead as by positive assertions.   (p. 249.)

8. SAME—*Knowledge of Falsity.*

If a statement of fact actually untrue is made by a person who honestly believes it to be true, but under such circumstances that the duty of knowing the truth rests upon him, which if fulfilled would have prevented him from making the statement, such misrepresentation is fraudulent in equity.   (p. 249.)

9. SAME.

False representation may be made by presenting that which is true, so as to create an impression which is false, and then profiting by the false impression thus created.   (p. 250.)

10. SAME.

The affirmation of what one does not know or believe to be true is equally, in morals and law, as unjust as the affirmation of that known to be positively false.   (p. 250.)

11. CANCELLATION OF INSTRUMENTS—*Grounds—Fraud.*

    Where there is misrepresentation or fraudulent concealment of superior knowledge acquired, a court of equity will intervene and rescind a contract thus obtained.  (p. 252.)

12. CONTRACTS—*Validity—Mistake.*

    Mistake of law alone will not, as a general rule, relieve one of the effect of his contract; but if such mistake is occasioned by the fraudulent representation or culpable negligence of another, or if the mistake of law is not pure and simple but is induced or accompanied by other special facts giving rise to an independent equity on behalf of the mistaken person, such as inequitable conduct of the other party, a court of equity will interpose its aid. (p. 252.)

Appeal from Circuit Court, Raleigh County.

Action by Paulina M. Tolley against L. E. Poteet and others.  From a decree in favor of defendants, plaintiff appeals.

<em>Reversed.   Remanded.</em>

J. W. McCREERY and BROWN, JACKSON & KNIGHT, for appellant.

DILLON & NUCKOLLS, OSENTEN & McPEAK, McGINNIS & HATCHER, and W. E. CHILTON, for appellees.

MILLER, JUDGE:

R. G. Trump and Margaret, his wife, February 17, 1890, by deed conveyed to C. E. Tolley and Paulina M., his wife, a tract of 460 acres of land in Raleigh county, upon which C. E. Tolley thereafter resided with his wife and children until his death in 1896.  While said deed was joint, the land was paid for by him individually.  By his will, made August 29, 1896, probated November 23, 1896, C. E. Tolley undertook to dispose of this land regardless of the interest of his wife therein.  By the second item thereof he devised to his wife all his household and kitchen furniture, farming tools, horses, cattle, hogs, sheep and other stock of which he died possessed, and "also all that portion of *my* farm upon which I now reside, and recently purchased of R. G. Trump, situated on the north side of Marsh Creek, being that portion of the farm upon which the dwelling house now occupied by myself and family now stands, * * * upon the condition that she remain a widow, and should she marry then the said bequeath

shall go to and be  *  *  *  divided equally between my two daughters, Virginia B. Tolley and Eva Tolley; and also upon the further condition that my said wife shall permit my said two daughters to remain with her until they shall marry, and then at my said wife's death the said bequeath shall descend to and be divided equally between my two daughters aforesaid forever." In order to make plain his meaning, the testator in the ninth item says: "The devise of the real (estate) to my beloved wife shall be so construed as to give her only an estate for her natural life, and I devise and bequeath to my beloved daughters Virginia B. and Eva Tolley the said real estate after the death of my said beloved wife." By the third item the testator devised to his son Robert L. Tolley "all the remainder of *my* said farm situate on the south side of said Marsh Creek, this bequeath to be governed by the bequests hereinafter made." Robert L. Tolley having died, the land so devised to him was by decree of the circuit court of October 29, 1898, in the suit of Lena E. Cole against Paulina M. Tolley and others, partitioned in kind among his heirs, and deeds made by A. P. Farley, special commissioner, for the several parts allotted to them respectively. The deed to Paulina M. Tolley, dated January 23, 1899, describes a tract by metes and bounds as containing 16 acres and 106 square poles.

November 26, 1902, Paulina M. Tolley, together with her children and others, joined in an option contract with the defendants C. T. Jones and G. A. Poteet (a brother of L. E. Poteet), by which they gave the said Jones and Poteet for six months from the date thereof the exclusive right to purchase at $50 per acre the coal in various tracts of land in Raleigh county, upon the terms of one-third of the purchase money cash upon delivery of the deeds and the residue in two equal payments in one and two years from date of deeds with interest payable annually. Included in the contract is tract No. 4 of 226 acres, owned by Virginia Clark, wife of Luther Clark, Mrs. C. E. Tolley and Eva Tolley, composed of eight parcels, described in the will of C. E. Tolley and deeds from A. P. Farley as special commissioner to Virginia Clark and from Lee Cole and wife and J. J. Tolley and wife to Virginia Clark. Tract No. 4 does not include the land devised to W. P. Tolley or Josephine Hutchinson.

May 22, 1903, four days before the option would have expired, the optionees Jones and Poteet, having secured from others an extension thereof to August 26, 1903, endeavored to secure a like extension from Paulina M. Tolley and her daughter Eva M. Tolley, but they declined. On May 23, 1903, the defendant L. E. Poteet, who had meanwhile been examining the records of deeds, made the discovery that the deed from R. G. Trump and wife conveyed the 460 acre tract to C. E. Tolley and Paulina M. Tolley jointly; and, although he admits he had knowledge of the provisions of the will of C. E. Tolley and that the widow and devisees were in possession of the various tracts devised to them, and had heard that Jones and his brother George then held said option contract, he, without any previous contract, or agreement as to price or terms of payment, prepared a deed from Paulina M. Tolley to himself whereby, in consideration of $800, $267.66 cash and the residue in two equal payments of like amount at one and two years, evidenced by his bonds of even date with the deed, the grantor, as recited, did with covenants of special warranty thereby "bargain, sell and convey unto the party of the second part *all* her right, title and interest in and to a certain tract or parcel of land situate in the county of Raleigh, in Trap Hill District, bounded as follows." The description of the land in the deed is identical with the metes and bounds of the deed for the 460 acres from R. G. Trump and wife, except that in the former the amount of acreage is significantly omitted. The consideration ($800), omitting the fraction of an acre, is the exact amount Mrs. Tolley should have received under the option from Jones and G. A. Poteet for the coal in the 16 acres she claimed in fee.

In explanation as to how, without previous agreement, he inserted this consideration in the deed, L. E. Poteet significantly says: "I learned from Mr. Clark it would take $50 per acre to get the 16 acres which she owned in fee, therefore I knew what to fix it at; secondly, I knew what I was willing to pay for the other, but I paid more than I instructed my brother to pay, but I don't remember whether I put all this in the face of the deed or not." It is important to say that there is no mention in the deed of any other consideration except the $800.

In explanation of why he omitted in the description to recite the number of acres, he says: "Well, I do not remember now why; I had some object in view at the time." He does say in the same connection: "I did not try to deceive any one; I even placed in the face of the deed reference to the deed made by Trump and wife,  *   *   *   *  I gave it to Clark to read and I read it to him."

On the same day this deed was made L. E. Poteet, as he claims, accidentally met his brother George at the hotel in Beckley. Luther Clark, the son-in-law of the plaintiff, by invitation of George, as the latter represents, and without any prearrangement with his brother, was there to assist in "looking up and locating the different tracts of land." In response to the question, "And agreed to give him $500 did you not?" George answers, "I told him if he came that he would not lose by it." Notwithstanding L. E. Poteet knew his brother George and Jones had the option on the lands of Mrs. Tolley and her children, he says: "I placed the deed in the hands of G. A. Poteet, who was accompanied by Mr. Clark. Mr. Clark told me he would do what he could to get the old lady to sign the deed." He also says in the same connection: "I further told him (George) that I had no money with me, and had none in Raleigh and none in the town of Beckley, and further that I did not know how much money she would want for her interest, and for that reason I told him to pay her the money provided she signed the deed, and would pay him later. I knew he had the money in bank at Beckley, and for that reason asked him to pay her; I told him  *   *   *  about the 16 acres which Mr. Clark had told me she owned in fee, and I told him what interest she had above that I did not know, but I was willing to pay a couple of hundred dollars, because it was uncertain. I did not know whether what she had was worth anything or not. It was a mere gamble, and I did not like at the outset to risk more than $200." He also says he had a conversation with Clark at the hotel regarding his mother-in-law's interest in the tract of land; that he told Clark in the presence of George that he wanted to buy his mother-in-law's interest in that land; that he showed Clark the deed he had written, and read it to him; that Clark read it and asked him a few questions about it, which he answered, and that

he seemed to be perfectly satisfied and said he would go along with George and thought he could get the old lady to sign it; that Clark said he did not know what interest she had, but thought she had some interest. Poteet nowhere states what either Clark's inquiries about the deed or his replies were; but it seems strange that after questions and answers, if Clark was perfectly satisfied, he should have immediately replied that he did not know what interest she had but was ready to go and get his mother-in-law to sign the deed. What was really in the mind of L. E. Poteet at the moment he was having this conversation with Clark is better told by him in another connection. At the time he was talking to Clark he was fresh from examining the records at the court house. He says: "I read the will  *   *   *   I saw where Callahill E. Tolley had attempted to distribute his land among his children. I did go to the records, and later saw the deed of Trump and wife. I did not look further. I knew or thought I knew that if Paulina M. Tolley owned one-half interest in the land that her husband could not by devise put the title in some one else, and of course I thought she had an interest was the reason that I attempted to buy it, and that was the only way I attempted to get it." In the face of this admission, when asked "Why did you not tell Luther Clark that by that deed you would get one-half undivided interest in that Russell G. Trump tract of land?" he answers, "I did not know it from the face of the deed. I did not know it then and I do not know it yet." He did not know, he says, that Jones and his brother George had an option on the same land; but he says, "I had understood they had it, but that was no concern of mine. Their business was separate from mine, and I did not know that they wanted to buy it."

Before we allow G. A. Poteet to proceed on his journey with Clark to get the old woman to execute the deed to his brother L. E. Poteet and thus to deprive himself and his partner Jones of their rights under the option contract, we should have his explanation. He says in response to a question: "My experience with Mrs. Tolley, or rather the statements of Mr. Jones to me concerning how hard she was to deal with, led me to believe that I could purchase the coal from L. E. Poteet, if I wanted to, as easily as I could from

Mrs. Tolley, as he was a business man and one that could be dealt with."

Luther Clark's version of what took place at the hotel does not accord with that of the Poteets. He says they claimed Mrs. Tolley had signed an option to make a deed she had no right to make, but that she had a dower right in the land on which she resided, which at her age according to the statute was not worth over $100, but that he (L. E. Poteet) was willing to pay her more than that but did not say what he would pay her; that G. A. Poteet said the time was up and he was going to have the old lady sign a deed according to option, or know the reason why.

After these preliminaries, George Poteet and one Summerfield, a notary employed by him, preceded by Clark, went to the residence of Mrs. Hutchinson in the country where Mrs. Tolley was visiting, taking with them the deed prepared by his brother, for the purpose of persuading her to sign it. On reaching the place Clark preceded Poteet into the house; Poteet spoke to Mrs. Tolley, called her into an adjoining room, after which he also called Clark in, and said to Mrs. Tolley that he had come down to close up the deed on the option she had given for the coal under the 16 acres, and that he also wanted a deed covering her dower right in the land on the north side of the creek and would give her $250 for it, but that the law would allow her only a little over $100; and he also stated to her that she had signed an option agreeing to make them a deed for something she did not have. Clark says: "After we had explained to her that the deed was for 16 acres of coal and for her dower right on the north side of the creek she signed it;" and Summerfield was then called in and took her acknowledgment. Clark says the deed was not read to Mrs. Tolley in his presence.

G. A. Poteet's statement of these negotiations with Mrs. Tolley is substantially as follows: that he told her he had come to get her to acknowledge a deed of conveyance to his brother L. E. Poteet for her entire interest in a tract of land on Marsh Fork called the Trump tract, and to see if she would make a deed of that kind; that she replied she thought she might as well sell her interest, as she was getting old and it would not do her much good; that he asked her what she was

willing to take for it; that she answered that she had given
Mr. Jones an option on 16 acres of land for $50 per acre but
thought she ought to have more than that; he inquired how
much more she wanted; that she asked just how much the
option price would amount to; that Mr. Clark calculated it
and told her; that he then asked her how much more than
that she would take, saying to her that he wanted the deed
for his brother for all the interest she had; that she then
wanted to know what he would give her, and he replied he
would rather she would set the price; that he finally asked
her if she would take $100 over and above the price of the
16 acres or whatever she had agreed in the option to convey,
to which she replied she thought she should have more than
that; that he inquired how much more and if she would take
$200; that she said she did not know whether that was
enough; that he then told her to state just what she would
take and if it suited him he would take it; that she told him
to state just what he would give and if the price suited her
she would take it; that he then told her he would give her
$250, which was $50 more than he was authorized by his
brother to pay; that after talking the matter over with Clark
she finally said she thought that was a fair price and she was
willing to make the conveyance; that he then read the deed
to her in the presence of Clark, and told her when he got
through that he did not know what interest she had in that
tract of land, but that the deed as he understood it conveyed
all her interests therein, and that Clark said he understood
it the same way and told her that Poteet had read the deed
to her correctly and that the explanation given her was just
as he (Clark) understood it from L. E. Poteet. George
further says that he did not state to Mrs. Tolley what in-
terest she had in the land; that he was not informed, and
knew nothing of this deed or the intention of L. E. Poteet
in purchasing Mrs. Tolley's interest until the latter came to
his room in the hotel where he and Clark were; that L. E.
Poteet read the deed to Clark and explained the matter to
him, but never mentioned it to him (George), and merely
asked him to go with Clark and pay the money for him. On
the same occasion G. A. Poteet on delivery of the deed paid
Mrs. Tolley, by the check of himself and Jones, $516.67, the
cash payment for the coal under the 16 acres and the addi-

tional $250 agreed upon, and delivered to her the two notes of L. E. Poteet called for in the deed.

Mrs. Tolley, whose memory is evidently poor, when examined as a witness did not recollect of the deed having been read to her before signing and acknowledging it, nor of Poteet telling her what the deed was for. She says it was the coal she was selling; that she sold the coal under one piece; that she did not want to sell it, but did so because Poteet was so bothersome and annoying; that when she signed the deed she did not know anything about having any other interest in the land; that she thought the deed was for the coal under the 16 acres. Summerfield, the notary, who was not in the house at the time, says the window was open and he thought he heard Poteet reading the deed; that when called in he asked Mrs. Tolley if she understood the contents of the deed, or if she wanted him to read it to her; that she replied she had heard the deed read and understood its contents, and that it was not necessary to read it to her again.

In explanation why, if his business was separate and distinct from that of Jones and his brother George, he did not himself go and get the deed from Mrs. Tolley, L. E. Poteet answered that from what he had heard from Mrs. Tolley he felt like he would rather send some one else; that he sent his brother George because it suited him to send him.

May 29, 1903, six days after the Poteets had with the aid of Clark procured the deed of May 23rd, which they formerly asserted was understood by and explained to not only Mrs. Tolley but also to Clark, who were satisfied therewith, and which was intended by L. E. Poteet, as he claims to have explained it to George and Clark beforehand, to cover all the interests of Mrs. Tolley in the entire tract of 460 acres, they suddenly concluded the deed covered too much; that by it, if valid, Mrs. Tolley had actually sold the very roof over her head and her life-estate in the part of the land devised to her for life. This situation was not likely to comport well with their alleged explanation, or the understanding either of Mrs. Tolley or Clark, as to the effect or purpose of the deed. This was the infernal machine which had to be gotten rid of, if the fruits of their scheme were to be preserved. At once L. E. Poteet prepared another deed and sent George A., his brother, and

Summerfield, the notary, back again to see Mrs. Tolley, with
the message that in the former deed he had gotten more from
her than he had intended, that he did not wish to disturb
her during her life in her home. They then tendered her
the new deed, which George says the notary read and ex-
plained to her that it was a deed-conveying to her her life time
interest in the land on the north side of the creek; and, al-
though the deed purported to be from L. E. Poteet to Mrs.
Tolley, they had her also sign and acknowledge it, who in
the same connection George says, when it was explained to
her that the former deed conveyed away all her interest in
the land, including the right to occupy the home she lived in
and the land devised to her for life, said she understood that
it did and was glad that Mr. Poteet was conveying it back
to her. The recitals of this new deed are very significant.
After reciting that the effect of the former deed from Mrs.
Tolley was to convey to L. E. Poteet *all* her right, title and
interest in the land described therein by metes and bounds,
under a "whereas" the deed recites it was the intention of
the said Paulina M. Tolley to convey to the said L. E. Poteet
by said deed all her right, title and interest in and to the
tract of land conveyed to C. E. Tolley and Paulina M. Tolley
by R. G. Trump and wife, "fully described in said deed,
*without regard to number of acres or price per acre*, except-
ing the life estate of the said Paulina M. Tolley to the sur-
face of that portion of said tract devised by C. E. Tolley,
deceased," that "the said deed conveys the entire right,
title and interest of the said Paulina M. Tolley in and to the
whole of said tract of land," and that it was the desire of the
parties thereto to correct the former deed by conveying to
the said Paulina M. Tolley a life estate in the surface only
of that portion of the land included within the boundaries of
the former deed, being the portion of the farm on the north
side of Marsh Creek upon which the dwelling house is
located; therefore the first party, in consideration of the
premises and the $250 theretofore paid by the first party,
receipt of which was acknowledged, did grant, bargain, sell
and convey unto the party of the second part "a life estate
in and to the surface only," etc. Mrs. Tolley had no ad-
viser when this deed was procured; no one was present ex-
cept herself and G. A. Poteet and the notary. The purpose

of the recitals, and of having Mrs. Tolley sign and acknowledge it, is too plain to be misunderstood. The plain intent, besides the one alluded to, was to get her to affirm that the former deed was to convey all her interest regardless of price or acreage, and thereby negative the idea that she had intended to convey only 16 acres of coal, and the falsehood that she could have intended to convey all her interest in the land without excepting the house over her head, and thereby if possible clinch the fruits of a wicked bargain.

While L. E. Poteet says he did not know what interest Mrs. Tolley had in the land, yet his purpose, plainly concealed, as he practically admits, was to acquire from Mrs. Tolley the entire half interest which he thought, after discovery of the deed from Trump and wife, was still invested in her, and which in his opinion her husband could not have disposed of by his will.

At the time G. A. Poteet and Jones secured the option contract from Mrs. Tolley and her children and others, they were promoting the formation of the Marsh Fork Coal and Land Company, and were securing these options for the purpose of turning them over to that company, and, as stated by himself, G. A. Poteet was willing to become the agent of his brother in securing the deed from Mrs. Tolley because he thought he could get the land from him if he wanted it. L. E. Poteet says he has no pecuniary interest in that company, his only interest being that of his friends who are stockholders. He was along with Jones and the notary and sat outside about May 18th, a few days before he got the deed from her, when they tried to get Mrs. Tolley and her daughter Eva to renew the option contract. Notwithstanding all this, he says he claims to have acquired by the deed from Mrs. Tolley one-half undivided interest in the 460 acres, and that he intends to hold whatever he got by that deed, not only against his brother and Jones and their Marsh Fork Coal and Land but against everybody else.

In the face of all these facts, G. A. Poteet and Jones proceeded to procure deeds from the children of Mrs. Tolley covering the same lands, and to execute their notes therefor, knowing of the claims of L. E. Poteet under the deed procured for him from Mrs. Tolley; and afterwards, when these notes became due, they brought suit against some, if not all,

of the children to restrain the collection thereof, on account
of the alleged defects of their title by reason of the claim of
L. E. Poteet under his deed.

The facts recited constitute the basis of the present suit.
They develop the well-planned conspiracy of shrewd traders,
combined with a lawyer's knowledge of legal rules and pre-
cedents, to cheat and defraud an old and infirm woman and
her confiding children out of half or more of their lands.
That they may not have succeeded does not detract one whit
from their plans and purposes, which they practically admit,
and which a bare recital of the facts is all that is necessary
to make plain.

Suit was begun against L. E. Poteet alone, October 24,
1903. In March following, process to answer an amended
bill was sued out against L. E. Poteet, G. A. Poteet and C.
T. Jones. In both the original and amended bills the plaintiff
sets up the facts substantially as herein detailed. She
charges that she is old and feeble and was not at the time
able mentally to transact business at all; that by means of the
option contract and by the conspiracy, falsehoods, conceal-
ments and deceptions practiced on her she was induced to
sign the deeds of May 23 and 29, 1903, in ignorance of the
fact, discovered by L. E. Poteet and concealed from her,
that the deed from Trump and wife conveyed the land to her
and her husband jointly; that she supposed the effect of
these deeds was, as represented to her, to convey the coal
under the 16 acres and her dower interest in the coal under
the land devised to her for life; that she did not learn the
facts until months afterwards. She alleges that at the time
her husband purchased the land from Trump he took pos-
session of the same and held it exclusively until his death as
his own; that in his lifetime he, with her knowledge, placed
some of his children in possession of parts of it, who had
made valuable improvements thereon, she not knowing that
the deed invested in her any interest therein; that on the
death of her husband she accepted the provisions of his will
and claimed under it; that on the death of her son R. L. Tol-
ley his portion was partitioned among her and his other
heirs, one lot of 16 acres falling to her; that all the devisees
took actual, open, exclusive possession of all the lands de-
vised to them, she with her daughters the home place north

of Marsh Creek; that she accepted under the will and treated
the same as disposing of all the real estate purchased from
Trump; and that she never at any time renounced the will.
In her original bill she tendered back the money received by
her and paid the same into the hands of the general receiver
of the court; and in her amended bill she says she is willing
to convey the coal under her tract of 16 acres, according to
the terms of the option contract with the said C. T. Jones
and G. A. Poteet, or to whomsoever they may direct, and
that she is willing to convey her lifetime interest in the coal
under the tract on the north side of Marsh Fork for $250,
according to her agreement with G. A. Poteet in the presence
of Luther Clark. She prays that the deeds of May 23 and
29, 1903, be set aside and the parties placed in the relative
position in which they were before these deeds were made,
and for general relief.

The answers of the defendants L. E. and G. A. Poteet are
general denials of fraud, conspiracy and deceit; they charge
that the deeds were fully explained to and understood by the
plaintiff, and that they were intended to convey her whole
interest in the land. The answer of Jones denies any knowl-
edge regarding the purchase of the interest of Mrs. Tolley
in the tract of land as charged in the bill, and neither admits
nor denies its allegations relating thereto, except that he ad-
mits the use of the money of himself and G. A. Poteet to
pay Mrs. Tolley.

The plaintiff and the defendant each proceeded in the court
below, and in this Court up to the time of the argument here,
upon the theory that the two deeds of the plaintiff in fact
operated to invest in L. E. Poteet a one-half undivided inter-
est in the 460 acres, regardless of the will of C. E. Tolley, her
acceptance of the provisions thereof and the suit partitioning
the land of R. L. Tolley among his heirs. If such was the
effect of those deeds, the pleadings and proofs would un-
doubtedly entitle the plaintiff to a cancellation or reforma-
tion thereof, and a restoration of the *status quo.* In their
brief filed in this Court, counsel for defendants in an adden-
dum say: "After the brief had been printed, counsel be-
came impressed with the view that the plaintiff, having
elected to take the benefits bestowed upon her under the
will, is estopped from asserting title to a one-half undivided

interest in the Trump farm, which Callahill E. Tolley attempted to dispose of in the said will. It appears from the will itself that Callahill E. Tolley attempted to dispose of the entire 'Trump farm,' and not his undivided one-half interest in it. In reference to it, he used the words 'my farm' and 'my said farm,' etc. The language used shows a clear intention to dispose of the entire 'Trump farm.' and not his undivided one-half interest in it. The plaintiff so understood it, as it appears from both her original and amended bills. He bestowed upon the plaintiff certain benefits, towit: 'all my household and kitchen furniture and also all the farming tools, horses, cattle, hogs, sheep and other stock of which I may die possessed,' and he also bestowed upon her a life estate in that part of the Trump farm north of the creek. It appears from both the plaintiff's original and amended bills that she accepted under the will. She is, therefore, estopped from claiming, as against the will, her undivided one-half interest in the land. The rule applicable to all cases is, 'that a person who is entitled to any benefit under a will, or other instrument, must, if he claims that benefit, abandon every right and interest the assertion of which would defeat even partially any of the provisions of that instrument.' *Rutherford* v. *Mayo*, 76 Va. 123; 1 Pom. Eq. Jur. §§ 461-2, 519; *Penn* v. *Guggenheimer*, 76 Va. 839; *Moore* v. *Harper*, 27 W. Va. 362; *Bennett* v. *Harper*, 36 W. Va. 546; *Beetson* v. *Scoops* (N. Y.), 79 N. E. 731. In some of the American states the property acquired by husband and wife after the marriage is known as their community property. The husband controls such property during his lifetime, but can only dispose of one-half of it by will at his death. If he disposes of the entire property and bestows upon his widow some benefit, which she accepts, she is estopped from asserting title to one-half of such property. Underhill on Wills, top page 1056; Page on Wills § 717. Applying this principle to the case at bar, it will be clearly seen that the only interest which the plaintiff, on May 23, 1903, had in the 'Trump farm,' was a life estate in that portion of it north of the creek and the sixteen acres south of the creek. The deed, executed on that day to L. E. Poteet conveying all of her right, title and interest in said farm, conveyed nothing more. In both her original and amended bills she said she

intended to convey that much. It will thus be seen that absolutely nothing passed, by the deed, except that which she intended to convey, according to her own contention as set forth in both her original and amended bills. We desire to apologize for our long brief in this case. The whole case, it seems to us, should be styled—'MUCH ADO ABOUT NOTHING.'"

The cases referred to by counsel fully sustain the propositions for which they are cited. As a corollary of these propositions, however, it is equally true that where one is required to make an election he is entitled to know all the facts affecting his choice and to inquire into and ascertain all the circumstances; and, where the election has been made in ignorance or under a mistake as to the real nature of the properties, or as to the nature of his own rights, such a mistake is regarded as one of fact rather than of law, and the election is not binding and a court of equity will permit it to be revoked, unless the rights of third persons have intervened which would be interfered with by the revocation. 1 Pom. Eq. Jur., § 512, and cases cited; *Tooke* v. *Hardeman*, 7 Ga. 20; *Wilbanks* v. *Wilbanks*, 18 Ill. 17; *Linton* v. *Crosby*, 61 Ia. 401; *Adsit* v. *Adsit*, 2 Johns. Ch. 448, 7 Am. Dec. 539; *Hindley* v. *Hindley*, 29 Hun 318; *Huston* v. *Cone*, 24 Ohio St. 11; *Millikin* v. *Williver*, 37 Ohio St. 460; *Anderson's Appeal*, 36 Pa. 476; *Bradford* v. *Kent*, 43 Pa. 474; *Elbert* v. *O'Neil*, 102 Pa. 302; *In re Woodburn's Est.*, 138 Pa. 606; *U. S.* v. *Duncan*, Fed. Cas. No. 15002; 4 McLean 99.

As the bill does not allege that the plaintiff accepted under the will, and she has not since her discovery in regard to the deed from Trump and wife chosen to revoke it; even if she could yet do so under our statute limiting the time for revocation to one year from the date of the probate of the will, we think she is by her acts and conduct concluded from now making an election contrary to the terms of the will. She participated in the partition proceeding, and accepted under a final decree of the court a deed for the 16 acres partitioned to her. By that decree she is forever concluded and estopped from asserting any claim as against the parties to that suit, and any attempt to make an election not to accept under the will would disturb her co-partitioners and involve injuriously the rights of third parties, particularly the purchasers under

the option contracts of other portions of the land devised by the testator and partitioned in said suit, all which would be opposed to the authorities cited. So far as the record shows, no suit has been instituted or threatened by the plaintiff or any other person since the discovery of the nature of the deed from Trump and wife; and, as the decree in that case was an appealable decree, not having been appealed from, it is now unimpeachable. The principle that a decree of a court of competent jurisdiction, in a suit between proper parties, is valid and conclusive until reversed in some proper proceeding in the same court or upon appeal to an appellate court, unless for fraud or surprise entitling the injured party to relief, has been applied in the case of partition proceedings like this. *Wilson* v. *Smith*, 22 Grat. 493; *Frazier* v. *Frazier*, 26 Grat. 500. So far therefore as the plaintiff is concerned, she is forever concluded from asserting any other or greater interest than she elected to take under the will and took by the decree of the court in the partition proceedings. Such was the nature of her title to the land described in the deeds of May 23 and 29, 1903; and counsel are correct in their conclusion, and we are clearly of the opinion, that by these deeds she could not and did not invest in the defendant L. E. Poteet any other right or title in the 460 acres than that with which she was invested and of which she had the *jus disponendi* at the date of said deeds.

This leads us to inquire what was the real contract if any between the plaintiff and defendant L. E. Poteet, what was the real subject matter thereof, and whether the minds of the parties ever concurred on the subject matter of the contract so that the same became binding and conclusive; and if not, has a court of equity power and authority to correct any error therein? The bill charges actual fraud, conspiracy, deceit and concealment of facts. If these charges are sustained, although the plaintiff may not be entitled to relief in all respects as prayed for, yet under the prayer for general relief the court can and ought to administer that measure of relief to which she is justly entitled.

We have passed by the question of competency of the plaintiff to transact business. We conclude from the evidence that, although she was old and infirm in mind and body, she had that degree of mental capacity which this Court has recog-

nized as sufficient to make a deed., But we do not put aside the charge, abundantly established by the evidence, that the plaintiff was entrapped by conspiracy, fraud, deceit and concealment of facts in relation to the Trump deed, and was thereby induced against her will to part with substantial interests in the land to which she was entitled under the will of her husband and the deed in the partition suit. The facts which we have recited which have been admitted by the defendants convict L. E. Poteet and G. A. Poteet of everything with which they have been charged. The fact that they adroitly involved the plaintiff's son-in-law Clark in their scheme, and succeeded in deceiving him as well as her, only emphasizes the shrewdness of the plot. He was a school teacher, but not a lawyer. He was their agent.

Let us recapitulate the operations of the scheme, all based upon the option contract with G. A. Poteet and Jones for the coal: first, the unsuccessful attempt to obtain an extension of the contract from the plaintiff and her daughter Eva, in which L. E. Poteet participated; then the discovery by L. E. Poteet that the Trump deed invested the title to the 460 acres in C. E. Tolley and wife; the sending for Clark by G. A. Poteet, on the pretense that he desired him to assist in looking up the lands in that vicinity, and upon this pretense enticing him to town, where he at once met L. E. Poteet; the employment of him for a different purpose—to go with G. A. Poteet to induce the old woman to sign a deed already prepared; the recital in that deed of the actual consideration stipulated in the option for the coal only in the 16 acres; the omission in the description of land of the number of acres; the claim of the defendants that they explained to Clark and the old woman the nature of the deed, that Clark and she fully understood the nature of the deed, and that it was intended by her to convey all her interest in the entire tract, they themselves now admitting that L. E. Poteet did not intend to take away from the old woman her home, he six days afterwards reconveying a life interest. This deed, if it had accomplished the purpose of L. E. Poteet, would not only have deprived the old woman of her home, but also her children of interests in the land devised and partitioned to them, and would injuriously affect them in their contract with G. A. Poteet and Jones for the sale of the coal in these lands. Almost immediately afterwards G. A. Poteet and his partner

Jones proceeded to take deeds for the coal for which they had contracts with the children of the plaintiff, and to execute their notes for the purchase money, the payment of which they are now seeking to avoid by suits against them on account of the deed which L. E. and G. A. Poteet fraudulently procured from the plaintiff. These and other admitted facts are wholly inconsistent with the claims of the defendants, and with every principle of fair dealing and justice. It can not be that the plaintiff understood the nature of the deeds; and it is equally clear that Clark, the son-in-law, was likewise deceived and entrapped. It is clearly to be seen that all these transactions were designed to induce both the plaintiff and Clark to believe that the deed of May 23, 1903, was intended to convey only the coal under the 16 acres—not the surface, the timber or any other mineral right therein, for the option did not provide for anything but the coal therein—and also her dower or life estate in the coal under the portion devised to her for life. Eva M. Tolley and Virginia B. Clark, the reversioners in the tract covered by the life estate of the widow, had signed the option contract; and it is entirely clear from the evidence that L. E. Poteet induced Clark, as well as the old lady, to believe that they wanted to secure the life estate of the plaintiff in the coal contracted for under that portion of the farm, so that they might operate it for coal before the death of the life-tenant if desirable. The plaintiff and Clark were acting upon the supposition that the only interest the plaintiff had was in the 16 acres and in that part of the farm in which she had the life estate. The defendants well knew, however, that they were seeking to get a larger interest, by reason of the fact alone which they had discovered—that the deed from Trump and wife had been made to C. E. Tolley and Paulina M. Tolley. That this was their purpose is manifest not only from what took place before and at the time the deeds were made to L. E. Poteet, but also from what has followed since in resisting the payment of the notes of Poteet and Jones.

If the deeds of May 23 and 29, 1903, are to stand, L. E. Poteet will have acquired the entire estate in fee in the 16 acres and the entire life estate in the coal, timber and all other minerals in the tract devised to the plaintiff; whereas

what she contracted and agreed to sell and convey, and what she understood the effect of her deed was to convey, was the fee in the coal under the 16 acres and her life estate in the coal alone under the other tract; and this we think is the limit of the rights of the defendant L. E. Poteet under his contract with her, and more than this he should not be permitted to hold. By her bill the plaintiff has offered to perfect such title in L. E. Poteet, and to execute to him or any one he may designate a deed conveying such interest in the coal in said tracts.

Fraud in the procurement of a contract avoids it; and where a party intentionally or by design misrepresents a material fact or produces a false impression, in order to mislead another or to entrap or cheat him, or to' obtain an undue advantage of him; in every such case there is positive fraud in the truest sense of the term; there is an evil act with an evil intent; *dolum malum ad circumveniendum.* And the misrepresentation may be as well by deeds or acts, as by words; by artifices to mislead, as well as by positive assertions. *Dickinson* v. *Railroad Co.*, 7 W. Va. 390; 1 Story Eq., § 192.

It is said by the defendant L. E. Poteet that he represented to Clark and his brother George, whom he constituted his agents to secure the plaintiff the deed in question, that he did not know what interest the plaintiff had in the land. He admits he had seen the deed from Trump and wife and the will of C. E. Tolley; that he knew the devisees and partitioners had been and were in possession of their lands; that Mrs. Tolley had elected to take under the will, as evidenced by the option contract and by the partition proceedings; and, as a lawyer, he should have concluded, as his counsel have on due consideration concluded, what actual interest the plaintiff had in the land. If a statement of fact, actually untrue, is made by a person who honestly believes it to be true, but under such circumstances that the duty of knowing the truth rests upon him, which, if fulfilled, would have prevented him from making the statement, such misrepresentations may be fraudulent in' equity. 2 Pom. Eq. Jur., § 888. A false representation may be made by presenting that which is true, so as to create an impression which is false, and then profiting by the false impression thus created. *Lumberman* v. *Johnson*, (N. J. Eq.), 24 Am. St. Rep. 410. Mr. Pomeroy

says (Eq. Jur., §§ 884, 885) that there can in law be no fraud, misrepresentation or concealment without some moral delinquency, and no legal fraud which is not also a moral fraud; yet that it is well settled by the ablest courts, English and American, that there may be actual fraud—not merely constructive fraud—in equity without any feature or incident of moral culpability. In *Dickinson* v. *Railroad Co.*, *supra*, it is said that whether the party thus misrepresenting a material fact knew it to be false, or made the assertion without knowing whether it were true or false, wholly immaterial; that the affirmation of what one does not know or believe to be true is equally, in morals and law, as unjust as the affirmation of that known to be positively false; that even if the party innocently misrepresents a material fact by mistake it is equally conclusive, for it operates as a surprise and imposition on the other party. 1 Story Eq., § 193; *Crump* v. *Mining Co.*, 7 Grat. 352. In *Bank* v. *Campbell*, 75 Va. 455, it is said: "Where there is misrepresentation or fraudulent concealment of superior knowledge acquired, a court of equity will intervene and rescind a contract thus obtained by fraud or misrepresentation. * * * It may be further conceded that mere silence on the part of the purchaser, or failure to disclose knowledge on his part of peculiar value to the property sold, would not be sufficient to set aside a sale fairly made without misrepresentation or fraud. But in the case before us the facts show more than mere silence and withholding knowledge acquired to the purchasers. On the contrary, it is conclusively shown that they not only actively concealed from the public the knowledge acquired by them, but misrepresented the facts within their knowledge."

It is claimed by the defendants that the means of information regarding the title were open to both parties, But it is equally true that when from the circumstances one is induced to rely upon the other party's representation the contract may be rescinded for the fraudulent misrepresentation. False representation or fraudulent concealment in respect to the subject matter of a contract will entitle the injured party to a rescission thereof. *Engeman* v. *Taylor*, 46 W. Va. 669. In *Goshorn* v. *Snodgrass*, 17 W. Va. 717, it is said that a deduction of fraud may be made not only from deceptive assertions and false representations, but from facts, incidents

and circumstances which may be trivial in themselves but in a given case be often decisive of a fraudulent design.

In this case the deeds were obtained by the shrewd artifices of the trader, accompanied by the knowledge of forms and precedents of the lawyer guiding the hand of the scrivener in the preparation thereof. The plaintiff was evidently ignorant not only of the facts, but also of the law relating to the subject matter of her contract. The defendant who obtained the deeds was mistaken as to neither, as he falsely represented. She had confidence in him and his agent. She was not on equal terms with them. While mistake of law alone will not, as a general rule, relieve one of the effect of his contract, yet such mistake occasioned by the fraudulent representation or culpable negligence of the other will warrant a court in granting the necessary relief. *Crislip* v. *Cain*, 19 W. Va. 438, 469, 470; *Schuttler* v. *Brandfass*, 41 W. Va. 201, 207; *Bruner & McCoach* v. *Miller*, 59 W. Va. 36, 40; *Newberger* v. *Wells*, 51 W. Va. 624, 631. In 2 Pom. Eq. Jur., § 842, it is said: "If the mistake of law is not pure and simple, but is induced or accompanied by other special facts giving rise to an independent equity on behalf of the mistaken person, such as inequitable conduct of the other party, there can be no doubt that a court of equity will interpose its aid."

The prayer of the bill is for rescission, and the question is: Can the Court, under the prayer for general relief, do more than set aside the deeds? As in our opinion the minds of the parties never met on the subject matter and terms of the contract, and the deeds of May 23 and 29, 1903, should be set aside for the reasons assigned, yet inasmuch as the plaintiff has evinced a willingness that the defendant L. E. Poteet should take and hold such interest in the land as she agreed to convey under the option and at the time the deeds were made and as the parties to the controversy may be willing that the matters in difference between them may be settled upon this basis, we are of opinion to reverse the decree of the circuit court and to remand the cause with directions that, if the defendant L. E. Poteet shall execute and deliver to the plaintiff a deed of quit claim reconveying to her all her right and interest in and to the said 16 acres and the land devised to her—except only the coal under the 16 acres with

mining rights and privileges as provided for in said option contract, and her life estate in the coal in the tract devised to her for life—then the deeds executed to him by the said Paulina M. Tolley on the 23rd day of May, 1903, and the 29th day of May, 1903, be decreed to invest in him the coal and coal rights so excepted in his deed of reconveyance; or,. in event he shall refuse to execute such deed of reconveyance, then to enter a decree cancelling and setting aside said former deeds.  This mode and manner of relief seems to be approved in the case of *Crislip* v. *Cain, supra,* and to be suggested also by the rules relating to the reformation of contracts.  *Le Comte* v. *Freshwater,* 56 W. Va. 336; *Pitcher* v. *Hennesy,* 48 N. Y. 415.  And it is so ordered.

*Reversed.  Remanded.*