This action was brought by plaintiffs to set aside a deed made by them to defendants, upon the ground of fraud.
It appeared in evidence that one John G. Gray died intestate on 12 September, 1917, seized and possessed of a large estate of both real and personal property, and left surviving him four heirs, the plaintiff inheriting an undivided one-fourth interest in the estate. On the day of Mr. Gray's death, while plaintiff was at the home of Mrs. Harrison (mother of defendants), where Mr. Gray died, for the purpose of attending the funeral, he was approached by the defendant Gregory and told for the first time that his uncle had died intestate, and that he was an heir. Gregory showed him money which he was paying the undertaker, and then called him into another room and told plaintiff he wanted to buy plaintiff's interest. He further stated that they had taken charge of the estate and investigated it, and that he did not think the estate would net above debts and expenses $4,000, making plaintiff's share not much more than $1,000, and perhaps not so much; and further, that they wished (on account of his mother's health and the effect it might have upon her to let the matter drag along) to close the matter up as quickly as possible. Harrison was called in, informed of what had taken place, and corroborated Gregory's statements as to the investigation and the value, and they offered plaintiff the $1,000 for his share for quick acceptance.
There was further evidence that plaintiff, having great confidence in defendants, informed them that he did not know about the estate, and *Page 192 
that if they had investigated the matter and thought that was all that was due him, he would take it, of course. He believed and relied upon these statements; plaintiff knew nothing of the notes, cash or chattels of the estate, and that plaintiff signed the deed in question next day, receiving in payment a note for $800 and interest, and the balance of $168 in cash. Both note and cash were taken by defendant from the estate, so that plaintiff was paid out of the estate itself. Plaintiff is a man of advanced years, poor health, and limited education, with practically no business experience, and his capacity for trading is below the average.
Six days later defendants paid $3,000 to plaintiff's sister for exactly the same interests; and four days later, Harrison, qualifying as administrator, made affidavit and inventory showing $2,400 worth of personalty belonging to the estate. Within thirty days the timber from a single tract of land was sold by defendants for $5,300, and there were practically no debts due by the estate, its total net value, at the time, was approximately eighteen to twenty-four thousand dollars, and plaintiff's share was, therefore, four thousand five hundred to six thousand dollars.
Gregory and Harrison are half brothers, sons of Mrs. Susie Harrison, sister of John G. Gray, the intestate, and they are first cousins of A. B. Bell, the plaintiff, whose father was a brother of John G. Gray.
Plaintiff testified as follows: "I do no recall who was at the house when I got there, but saw Mr. Harrison and Mr. Gregory there. I had not been there over an hour before mention was made to me of my uncle's affairs. At the time I went there I had no information that I would participate in the estate of my uncle. It was first brought up by Mr. Gregory. Q. Tell what was said by him, and how it came up? A. He said Brother John is dead and left no will. Q. I want to know if you were present when any money was paid to the undertaker? A. Yes; he came out there with three bills in his hands, twenties and a ten, and he came out there and said, do you see that, and then went on and gave it to the undertaker. Q. Was anything else said by him? A. No. Q. What was the next thing that he did? A. He touched me on the shoulder and said let me see you a minute, and I went on down there and went in the house, and got in a room on the south end of the house and locked the door, and then he said he wanted to buy me off, and he said that Brother John had died without a will, and our attorney says that you and your sister are half owners in the estate, and I said, are we? and he said `Yes,' and I told him I did not know anything about it, and he said we want to buy you off. Q. Did Mr. Harrison come in? A. Yes; later he said we want to buy you off, and we have investigated the matter, and I think that $1,000 is as much as you will get, and we want to close up the matter as quickly as possible on account of mother (Mrs. Susie Harrison). He said that it might amount to more than $1,000, or not *Page 193 
quite as much. Q. Why on account of her? A. He said that she was frail and that it would be the end of her. I had no information about the indebtedness of my uncle, and none at all about the expenses. I said I did not know anything about it. Harrison was not in there then. After he said he would give $1,000, and I might not get as much, he said I will go back and get Billie and we will talk the matter over. He (Gregory) says, you know that you have had $2,000, and I (Gregory) have not had a penny, and have been for thirty years a servant, and have had nothing, not even a penny. I said I will leave the matter to you, and if you have been and investigated it I reckon I will take it. He then went and got Billie (who is Harrison), and he told Billie what I had agreed on. Mr. Harrison said, I think that is a fair proposition. He mentioned to Harrison what he told me about having taken charge and investigated. He said to Mr. Harrison that he did not think it would exceed over $1,000, and Mr. Harrison said that he did not think so either. No one else was present. Mr. Gregory said that he did not want to go in court. I said I do not know about the estate, and if you have investigated the matter and think that is all that is due me, of course I will take it. It is a fact that I had not investigated it, and relied upon them. I had confidence in them, and we were brother and sister's children. We were always friends. I associated with them. We have always been warm friends, and I had all manner of confidence in them, and thought that they would treat me right, because we were boys together and cousins. I believed what they said about it. They told me to keep it a secret, and not even to tell my wife when I went home. This was said at the time, before we left the room. I do not know what personal property my uncle had. I knew nothing about the notes. He never said anything about any notes, said nothing about cash. All the cash that I saw was what he brought out there, and he just mentioned that much. I do not know anything about the gas boat that my uncle owned. I knew nothing about his indebtedness. This was on 13 September, between 12 and 1 o'clock. I remained until after two o'clock, until after the funeral was over. I think Mr. Harrison is a good, ordinary farm man. He had good experience; he had been a steward in the Methodist Church, and I thought he could be relied upon. I had confidence in him. Do not think either one of them had ever lived with their uncle, Mr. Gray. They used to go to the house where he and their mother lived right often, and they were there most every time I went. I went home about sundown. I went home from the burial. The body was still in the house when the conversation took place; saw them next morning, near 8 o'clock. They were down the road in an automobile, coming to my house. They came there and I went and got in the automobile and went to the register of deeds' office. The *Page 194 
register of deeds had an office in a store in Shiloh, where we went. When we reached the office of Mr. Forbes, the register of deeds of Shiloh, they said we have come to have a deed fixed. I went with them to Mr. Forbes'. I only knew the boundaries of the place on one side. It was the piece of land that I had inherited from my grandmother. Mr. Gregory told Mr. Forbes, who came to my corner, then I gave the description down to my line. This piece was known as the Flora place. Q. Tell if you signed the deed there? A. Yes. Q. Was anything paid you then? A. No. Q. Was anything said about the note? A. No. Q. What did you do then? A. They went back to my house. Q. All three of you together? A. Yes. Q. Did you see your wife there? A. Yes. Q. Did you go in? A. No. Q. Had you told your wife anything about this trade? A. No; not until I started from the house to the steps in an automobile; she asked me where I was going, and I said I was going to make a deed to them, and I said that they had promised to give $1,000, and asked her what she thought about it, and about that time I was on the steps and they were hurrying me up. Q. Did you tell her what the estate would net? A. No; I said they would give me $1,000 for my interest in the estate. Q. Do you remember everything that you said to her? A. That was all that I said to her. Q. When you came back she signed the deed then? A. Yes; we all went in the porch and Mr. Forbes went in the house, and none of the others. Forbes went in there and she signed the deed and he came back on the porch, and then Gregory said, I guess you just as soon have a good note, and I said I don't know that it would make much difference, and he said I have got two, one due this January and one next, and I said if I have to take either one, give me the one due this January. Q. Did you look at the notes? A. No. Q. Did you know the signers of the note? A. No. Q. Did you know anything about the signatures to the note? A. No; he just said that it was a good note. Q. How much cash did he pay you. A. $168. Q. The note belonged to the estate of John Gray? A. Yes."
There was much evidence offered on both sides upon the issue of fraud. The jury returned the following verdict.
"1. Was the deed dated 14 September, 1917, obtained by the defendants, or either of them, by fraud, as alleged in the complaint? Answer: `Yes.'"
Judgment for plaintiffs, and defendants appealed.
after stating the case: There was ample evidence to support the finding of the jury, that the deed executed by the plaintiffs *Page 195 
to the defendants was obtained by fraud, that is, that defendants falsely represented to the plaintiff, A. B. Bell, the value of the estate with the intention of inducing him to part with his share of it at a greatly reduced price, and that he was persuaded to do so by reasonably acting upon the representations, which he believed to be true. The defendants stated to him that they had investigated the affairs of the estate, which they had in charge, and knew its value. The jury could well infer that they intended to take advantage of his known ignorance of the true situation, and to mislead him as to the correct value of his interest in the estate, with a view to acquire it for their own benefit at an undervalue. There is evidence that he placed full confidence in what they said to him about the value of the estate, and this they well knew, and took advantage of it, and of his ignorance, and lack of business judgment and capacity to make a large profit on the transaction. He seems to have been an easy prey to their allurements, and to have quickly succumbed to their insidious practices and deceptive inducements. It must be done at once, they said to him, so as not to worry their mother, Mrs. Harrison, and he was asked not to tell any one of it, not even his wife. This was done to prevent detection of their scheme to defraud him by his consulting others wiser than he, and whose advice might defeat their purpose. For this reason, too, they started early to lay their plans, even before the burial of the intestate. If the jury believed the plaintiff's witnesses, as it appears was the case, it was rather a bold case of fraud.
The case, in its main and essential features, is not, in principle at least, unlike Walsh v. Hall, 66 N.C. 233; Hodges v. Wilson, 165 N.C. 323;Dixon v. Green, 178 N.C. 205; Modlin v. R. R., 145 N.C. 218;Whitehurst v. Ins. Co., 149 N.C. 273; Sprinkle v. Wellborn, 140 N.C. 163;Griffin v. Lumber Co., 140 N.C. 514. It was said in the Whitehurstcase that it is not always required for the establishment of actionable fraud, that a false representation should be knowingly made. It is well recognized with us that, under certain conditions and circumstances, if a party to a bargain avers the existence of a material fact recklessly, or affirms its existence positively, when he is consciously ignorant whether it be true or false, he may be held responsible for a falsehood; and this doctrine is especially applicable when the parties to a bargain are not upon equal terms with reference to the representation, the one, for instance, being under a duty to investigate, and in a position to know the truth, and the other relying and having reasonable ground to rely upon the statements as importing verity, citing Modlin v. R. R., supra; Ramsey v.Wallace, 100 N.C. 75; Cooper v. Schlesinger, 111 U.S. 148; Pollock on Torts (7 ed.), 276; Smith on Frauds, 3; Kerr on Fraud and Mistake, 68. And it is further held there, on the authority of Pollock on Torts, supra, that in order to create a right of action for deceit there *Page 196 
must be a statement made by the defendant, or the person charged with the fraud, and with regard to that statement the following conditions or elements must be present and concur: It must be untrue in fact; the person making the statement, or the person responsible for it, must either know it to be untrue, or be culpably ignorant (that is, recklessly and consciously ignorant), whether it be true or not; it must be made with the intent that the other party should act upon it, or in a manner apparently fitted for that purpose, or calculated to induce him to so act, and, finally, that he does act in reliance on the statement in the manner contemplated, or manifestly probable, and thereby suffers damage. And Smith on Frauds,supra, is quoted in support of the principle as follows: "The false representation of a fact which materially affects the value of the contract, and which is peculiarly within the knowledge of the person making it, and in respect to which the other party, in the exercise of proper vigilance, had not an equal opportunity of ascertaining the truth, is fraudulent. Thus representations made by a vendor to a purchaser of matters within his own peculiar knowledge, whereby the purchaser is injured, is a fraud which is actionable. Where facts are not equally known to both sides a statement of opinion by one who knows the facts best involves very often a statement of a material fact, for he, impliedly, states that he knows facts which justify his opinion."
Kerr on Fraud and Mistake, supra, refers to the doctrine in this language: "A misrepresentation, however, is a fraud at law, although made innocently, and with an honest belief in its truth, if it be made by a man who ought in the due discharge of his duty to have known the truth, or who formerly knew, and ought to have remembered, the fact which negatives the representation, and be made under such circumstances or in such a way as to induce a reasonable man to believe that it was true, and was meant to be acted on, and has been acted on by him, accordingly, to his prejudice. If a duty is cast upon a man to know the truth, and he makes a representation in such a way as to induce a reasonable man to believe that it is true, and is meant to be acted on, he cannot be heard to say, if the representation proves to be untrue, that he believed it to be true, and made the misstatement through mistake, or ignorance or forgetfulness."
The general rule seems to be established in recent years that where an action for damages will lie for a deceit, in the sale of land, a suit in equity, now a civil action, may be maintained to set aside the deed for the fraud. It is so held in Walsh v. Hall, supra, which is approved in Griffinv. Lumber Co., supra, where the Court said: "Whatever doubt may have existed in regard to the right to maintain an action for deceit relating to contracts for the sale of land respecting acreage, title, etc., is removed by the decision in Walsh v. Hall, 66 N.C. 233. Dick, J., *Page 197 
after noting the general rule of caveat emptor, says: `But in cases of positive fraud a different rule applies. . . . The law does not require a prudent man to deal with every one as a rascal, and demand covenants to guard against the falsehood of every representation which may be made as to facts which constitute material inducements to a contract. . . . If representations are made by one party to a trade which may be reasonably relied upon by the other party — and they constitute a material inducement to the contract — and such representations are false within the knowledge of the party making them, and they cause loss and damage to the party relying on them, and he has acted with ordinary prudence in the matter, he is entitled to relief in any court of justice.'"
The rule as to actionable deceit was originally stated in Pasley v.Freeman, 3 Term Rep., 51 (2 Smith's Leading Cases (5 Am. Ed.), margin page 55), as follows: "A false affirmation, made by the defendant with intent to defraud the plaintiff, whereby the plaintiff receives damages, is the ground of an action upon the case in the nature of deceit. In such an action it is not necessary that the defendant should be benefited by the deceit, or that he should collude with the person who is."
Chancellor Kent said of the rule, as thus stated, that the case went not upon any new ground, but upon the application of a principle of natural justice, long recognized in the law, that fraud or deceit, accompanied with damage, is a good cause of action, and that it is as just and permanent a principle as any in our whole jurisprudence. And the doctrine is equally well settled in equity that fraud will avoid a contract when a party is misled without his fault, and to his prejudice, by the dishonest practices of another to his prejudice, which were calculated and expected to deceive him into acting imprudently. The rule is clearly stated by another Court, which held that fraud in the procurement of a contract avoids it; and where a party intentionally or by design misrepresents a material fact or produces a false impression in order to mislead another or to entrap or cheat him or to obtain an undue advantage over him, in every such case there is positive fraud in the truest sense of the term — there is an evil act with an evil intent — and the misrepresentation may be as well by deeds and acts as by words, by artifices to mislead as by positive assertions. Tolley v. Poteet, 62 W. Va. 231. See, also, Butler v. Watkins, 13 Wallace, 456 (20 L.Ed., 629); Laidlow v. Organ, 2 Wheaton, 178 (4 L.Ed., 214).
In a court of conscience a deliberate falsehood, or deliberate concealment, it being equivalent thereto, as to a material element in the contract of sale, which is calculated to deceive and mislead another into making the same, and so intended, will induce the court to intervene in behalf of the injured party, to prevent a consummation of the fraud, or to restore *Page 198 
his rights to him. Crosby v. Buchanan, 23 Wallace (U.S.), 420. It will be observed that in some of the cases we have cited, the courts were dealing with a fraudulent concealment of material facts where the offending party was under a duty or obligation to disclose them to the other contracting party, but this case is stronger than those, because here the representation of value was knowingly false, and actually misled the plaintiff into conveying his interest in the estate to the defendants, whereby he lost, and they gained, a large sum. It is a clear case of fraudulent deception and circumvention, if we accept the evidence of the plaintiffs as true, which the jury did. The plaintiff had no substantial knowledge of the facts in regard to the value of the estate, and defendants knew that he was ignorant of it. They took advantage of this ignorance by misleading him as to its true value, stating, in order to inspire confidence in them, that they had actually investigated the matter and knew what it was worth, and hurried him into acting, so that he could not acquire correct information of its value before signing the deed, or take the advice of his friends. They will not be heard to say, under the circumstances, that he should not have believed or trusted them, for they were stating positively a fact as within their knowledge, ad he, having confidence in their integrity, as he stated, relied upon their statement, and was thereby prevented from making any investigation in his own behalf. They were shrewd traders, and he was not, having had little or no experience in business affairs. As the jury evidently found the facts to be, a case of intentional fraud was completely made out, and the charge, in respect to that feature, was correct, and the court gave all the instructions to which defendants were entitled.
In regard to the instruction as to the effect "of a grossly inadequate consideration alone being a fact from which fraud could be inferred," if it be true, when the whole charge is considered, that the court so instructed the jury, and that it was erroneous to do so, the record shows that the court was responding to a request from the defendants as to what would constitute such a consideration, and as to its effect upon the question of fraud; and its sufficiency, of itself, to show fraud. A party cannot complain of an instruction given at his own request; nor will an assignment of error be sustained which conflicts with the statement of the case upon the question whether the instruction was so given. The judge's statement, as to what was done, must stand, in the absence of any correction of the record by certiorari or otherwise.
The court correctly told the jury that they might consider the inadequacy of the consideration upon the question of fraud. Hodges v.Wilson, supra, and the jury, it would appear, based their finding, not alone upon the inadequacy of consideration, however "gross" it was, but upon the allegations of the complaint, and the entire evidence supporting *Page 199 
them, so that it is found that the false representations were made by defendants with intent to deceive the plaintiff, who was induced thereby to convey his land to them for an inadequate consideration, and, in that view, if the instruction had been given by the judge without any request from defendants, and was erroneous, it did no harm.
We have carefully reviewed this case, and find no error therein of which the defendants can justly complain.
No error.