### STANDARD ROLLER BEARING CO. et al. v. HESS–BRIGHT MFG. CO.

(District Court, D. Delaware. February 19, 1920.)

No. 366.

1. Patents ⊕209(1)—Supplemental agreement by patent licensee's officers and receivers, permitting licenses to others, held not improvident.

A supplemental agreement by the officers and receivers of a corporation holding a license to make a particular type of bearings under a patent, by which the corporation waived the provision of the original contract prohibiting licenses to others in return for the right to make any type of bearings covered by the patent and for a rebate on the royalties, *held* not so improvident as to indicate fraud, though a court decision as to the scope of the patent had necessitated procuring licenses by other manufacturers of bearings.

2. Patents ⊕209(1)—Fraud by president and receivers of corporation in making supplemental contract held not established.

A letter by the owner of a patent to the president of a licensee corporation, refusing consent to an assignment of the license, but agreeing to give license to the president or his nominee, *held* not to establish fraud by the president in making a supplemental agreement, four months before the letter was written, consenting to licenses to other corporations which were not improvident, and which were known to the majority of the stockholders and directors before the contract was signed.

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Contracts ⟐⟝108(2)—Contract in violation of injunction is binding on wrongdoer.**

A contract by a corporation, made in violation of an injunction in receivership proceedings, is not void, though it may be avoided by persons injured thereby; but it is binding on the corporation.

**4. Corporations ⟐⟝559(1)—Appointment of receivers does not deprive of power to contract.**

The appointment of receivers for an insolvent corporation, even if accompanied by an injunction against any transactions by the corporation, does not deprive the corporation of its corporate powers, though the exercise of such powers may subject it to penalty, and contracts made by it may be set aside by persons injured thereby.

**5. Corporations ⟐⟝426(10)—Receipt of benefits held to show implied ratification of contract.**

Where the president of a corporation, with the approval of its receivers, but without authority from the directors, made a contract, the terms of which were known to the majority of the directors, and probably of the stockholders, and the corporation and its receivers made no objection thereto, but continued to accept benefits under the contract for more than two years, a ratification of the contract is implied.

In Equity. Suit by the Standard Roller Bearing Company and another against the Hess-Bright Manufacturing Company. On final hearing. Bill dismissed.

Edward D. Robbins, of New Haven, Conn., and William S. Prickett, of Wilmington, Del., for plaintiff Standard Roller Bearing Co.

Ward, Gray & Neary and Andrew C. Gray, all of Wilmington, Del., for plaintiff Brown Bros. & Co.

Richard V. Lindabury, of Newark, N. J., Robert Fletcher Rogers, of New York City, J. Edward Ashmead, of Newark, N. J., and Owen J. Roberts, of Philadelphia, Pa., for defendant.

MORRIS, District Judge. Standard Roller Bearing Company, a New Jersey corporation, one of the plaintiffs (hereinafter called the plaintiff), and a licensee under United States patents No. 822,723 and No. 838,303, in its bill of complaint alleges infringement of its rights by the defendant, the Hess-Bright Manufacturing Company, a Delaware corporation, and prays an injunction and an accounting. The licensee joins as parties plaintiff the copartners of Brown Bros. & Co., the present owners of the legal title to the above-mentioned patents. The defendant, after granting a license to the plaintiff, granted to others licenses covering the same device. The plaintiff asserts, and the defendant denies, that, in view of the scope of plaintiff's license, such acts were infringements. The validity of the patents is not questioned. The scope of plaintiff's license, thus made the underlying question in the cause, depends solely upon the validity of a so-called second supplemental license agreement made between the plaintiff and defendant, and ratified by the ancillary receivers of the plaintiff on the 8th day of July, 1915. The bill of complaint, in addition to its prayers for an injunction and an accounting, prays a decree adjudging the second supplemental agreement to be null and void, and the plaintiff to be entitled to the rights conferred upon it by the original license agreement. The

⟐⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

alleged invalidity is based upon the contentions that the agreement was fraudulently made; that by reason of the receivership decree the plaintiff was without power to make the agreement; that the officers of the plaintiff, in executing the agreement, were acting without corporate authority; and that the ancillary receivers had no jurisdiction in the premises. The case was heard on bill, answer, documentary evidence, and oral testimony taken in open court.

The two patents, No. 822,723, for an improvement in ball bearings, granted June 5, 1906, and No. 828,303, for a method of manufacturing and assembling ball bearings, granted December 11, 1906, to one Robert Conrad, were assigned by him to a German company. The German company granted unto the Hess-Bright Manufacturing Company, a New Jersey corporation, a sole and exclusive license to make, use, and sell within the United States and its territories the said inventions, and also empowered the company last named to make agreements granting to or conferring upon others any or all rights under said patents, and in the name of the German company to sue for infringements of said patents or any rights thereunder. Subsequently an infringement suit under said patents was instituted in the Circuit Court of the United States for the Eastern District of Pennsylvania, in the name of the German company and the Hess-Bright Manufacturing Company of New Jersey, against the Standard Roller Bearing Company. Therein it was held that the form of ball bearing made by the Standard Roller Bearing Company infringed the Conrad patents. 177 Fed. 435. In settlement of that litigation the parties thereto, on the 6th day of June, 1910, entered into an agreement (herein called the original agreement) whereby the Standard Roller Bearing Company was licensed and empowered—

"to make, use, and sell ball bearings of the licensed form below specified throughout the United States and territories thereof under and by virtue of the said letters patent to the full end of the term of said letters patent, it being, however, specifically understood and stipulated that such power and license be nonassignable; and it being further specifically understood and stipulated that this license and power shall be limited to that form or embodiment of ball bearings, wherein the raceway or grooves are uninterrupted and continuous, and wherein filling openings are formed in the rings of such extent and depth that when the two rings are held in concentric position and also against peripheral or general deformation, the balls may be introduced or forced through the filling openings into the grooves or raceway in the rings without substantial injury to the surface designed for rolling contact; and it being further understood and agreed that no similar license or power shall be granted by the party of the first part to any other person, firm, or corporation without the written consent of the party of the second part."

The original agreement likewise provided, among other things, for the payment of certain royalties, the making of monthly settlements by the licensee, limitations upon the price at which the product of the licensee could be sold, and for the prosecution of infringers by the licensor. This agreement was approved by the defendant herein, it being then about to acquire the interest of the New Jersey corporation, in said letters patent. A further agreement, known as the first supplemental agreement, was subsequently made upon the same day. Its

purpose was to explain, but not to alter, the meaning of the original agreement.

The United States District Court for the District of New Jersey, on the 22d day of October, 1913, upon a stockholders' and creditors' bill filed against Standard Roller Bearing Company, alleging its inability to meet and discharge its matured and maturing obligations, and upon an answer filed by the defendant admitting the allegations of the bill, appointed under its general equity powers Robert S. Woodward, Jr., and S. Laurence Bodine, of Pennsylvania, and Thomas L. Gaskill, of New Jersey, receivers—

"of all and singular the lands, tenements, and hereditaments of defendant, and of all its real and personal property, business, shares of stock, rights, assets, and effects of whatsoever nature and kind and wheresoever the same may be situate, including also its buildings, plants, machinery, tools, merchandise, bills and accounts receivable, cash in hand and in bank, and all of its contracts, rights, choses in action, and other corporate rights and franchises, and its income and profits."

The decree further provided that the receivers should take into their possession the property of the defendant of whatsoever nature; that the receivers should manage and operate the property, conduct the business of the defendant, and preserve the properties, assets, and effects in proper condition and repair, and in their discretion to compound and settle with any debtor of the corporation with persons having possession of its property or in any way responsible at law or in equity to the corporation, upon such terms and in such manner as they might deem just and beneficial to the corporation; that the defendant company should forthwith turn over and deliver to the receivers all its property and assets; and that the business of the defendant company might be wound up and its property and franchises converted into money. The decree also enjoined the defendant and its officers from selling, transferring, or disposing of, or in any manner interfering with, any of the property of the defendant company, or from doing any act or thing to prevent the discharge by the receivers of their duties or the operation of said properties under the order of the court. Thereafter, but upon the same day, a bill of complaint setting up the appointment of receivers in New Jersey, the presence of assets in Pennsylvania and praying the appointment of ancillary receivers, was filed against the Standard Roller Bearing Company in the District Court of the United States for the Eastern District of Pennsylvania. The allegations of the bill were admitted by an answer filed simultaneously with the bill. A decree was thereupon entered, appointing Robert S. Woodward, Jr., and S. Laurence Bodine receivers—

"of all and singular the said defendant, and of all the lands, tenements, hereditaments of the defendant, and of all its real and personal property described in said bill of complaint, situate in the state of Pennsylvania, and also all of its business, shares of stock, rights, assets, and effects of whatsoever nature and kind, situate in said state, including also its buildings, plants, machinery, tools, merchandise, bills and accounts receivable, cash in hand and in bank, and all its contracts, rights, and choses in action, and other corporate rights and franchises, and its income and profits accruing and to accrue in said state."

Other provisions of the decree are identical with those of the New Jersey decree, save only that the Pennsylvania decree is expressly limited in its several paragraphs to the property, business, assets, and effects of the Standard Roller Bearing Company in the state of Pennsylvania. The receivers took possession of the business of the Standard Roller Bearing Company and conducted it. In conducting such business the receivers, acting upon the theory that the license granted under the Conrad patents inured to their benefit, made and sold bearings of the type described in the original license agreement.

Upon July 8, 1915, the second supplemental agreement was entered into. This agreement purports on its face to have been made by the plaintiff and defendant herein, and ratified by the ancillary receivers. It recites the original and supplemental agreement of June 6, 1910; that the Hess-Bright Manufacturing Company of New Jersey was duly succeeded in its rights by the Hess-Bright Manufacturing Company of Delaware; that by the original agreement the Standard Roller Bearing Company was licensed to make only a certain special restricted form of the patented invention, "and now desires that such license be extended to all the inventions and improvements of said patents, generally and without restriction as to form"; and that by the original agreement the Hess-Bright Manufacturing Company was prohibited from granting to other persons, without the consent of the Standard Roller Bearing Company, licenses for the same type of bearing, "and now desires to be released from such prohibition, so that it may freely grant any desired licenses, rights, titles, or interest" under the said patents to any person or persons whatsoever. The second supplemental agreement then provides that the clause of the original agreement hereinbefore quoted shall be revised to read as follows:

"The party of the second part [the Standard Roller Bearing Company] is hereby licensed and empowered to make, use, and sell, throughout the United States and territories thereof, as well as Canada and Mexico, to the full end of the term of said letters patent, ball bearings embodying all the invention and improvements disclosed and claimed in said letters patent, whether or not of that form or embodiment heretofore made and sold by the party of the second part; it being, however, specifically understood and stipulated that such power and license hereby granted be and is nonassignable; and it being further understood and agreed that the party of the first part shall have the liberty of granting similar licenses or any other licenses, rights, titles, or interests to any other person, firm, or corporation, and shall be at liberty to deal in any other way desired by it with respect to said letters patent, this license in favor of the party of the second part being a bare license or permission for it to make, use, and sell under said letters patent."

The second supplemental agreement further provides that, save for the foregoing modification, the original agreement shall remain in full force; that the licensor will pay to the Standard Roller Bearing Company amounts equal to 20 per cent of the royalties thereafter received from the Standard Roller Bearing Company; and that in the event the licensor gives concessions as to discounts or prices or royalties to any other licensee more advantageous than then enjoyed by the Standard Roller Bearing Company, then in that event the last-named company shall be entitled to the same concessions, and that in addition thereto the Standard Roller Bearing Company shall be entitled to the

aforesaid rebate of 20 per cent. on all royalties paid by it in excess of 7½ per cent. The corporate names of the parties were subscribed to the agreement by their respective presidents. The corporate seals attested by their respective secretaries, were also affixed thereto. The ancillary receivers appended a confirmation in the following form:

"The undersigned, being the receivers of the Standard Roller Bearing Company, the above-named party of the second part, do hereby confirm, ratify, assent, and join in the above agreement, on behalf of the said party of the second part, and of ourselves, as receivers, and of the stockholders and creditors of said company.           [Signed]   R. S. Woodward, Jr., Receiver.
                                          "[Signed]   S. Laurence Bodine, Receiver."

Was this agreement fraudulently made? The nature of the fraud asserted by the plaintiff is not misrepresentation or concealment, but is rather that Woodward, who signed the contract as president of the plaintiff corporation and as one of its receivers, so acted, not in the interest of the plaintiff, but in furtherance of his individual interests, and that the defendant, not only had notice of Woodward's breach of trust, but in fact induced it. It appears from the evidence that the agreement was made on behalf of the plaintiff by its officers without their having been authorized so to do by its board of directors. It was ratified by the ancillary receivers without first submitting the proposed contract to the court for its instructions. For many years prior to the execution of the second supplemental agreement several companies, notably the New Departure Manufacturing Company, of Bristol, Conn., had been manufacturing bearings similar in principle and design to the bearing described in the above-mentioned original license agreement without a license under the Conrad patents. On March 9, 1915, the Circuit Court of Appeals of this circuit denied a motion for a rehearing in the case of Hess-Bright Manufacturing Co. v. Fichtel, 219 Fed. 723, 135 C. C. A. 421, whereby it became finally settled, and so recognized by the trade, that the bearing of the type described in the original license agreement to the plaintiff was within the scope of the Conrad patents. The defendant on July 20, 1915, granted unto the New Departure Manufacturing Company the nonexclusive right and license to make, use, and sell, throughout the United States and all other territory as to which the defendant had the power to grant such rights, bearings embodying or containing any or all of the inventions recited in letters patent No. 822,723, and to use, practice, and employ in the manufacture and assembling of such bearings any or all of the inventions recited in letters patent No. 838,303, with certain exceptions not material to this case. Similar licenses were subsequently and during the year 1915 granted by the defendant to several other companies that had been theretofore operating without a license. The defendant, some months after the contract in question was made, and when a plan of reorganization of the Standard Roller Bearing Company was being considered, declined to consent to an assignment of the license then held by the Standard Roller Bearing Company to a new company, and declined to grant a new license to such new or reorganized company, but expressed a willingness to grant a license to Woodward or his nominee. Woodward declined to designate the new or reorganized

company as his nominee, unless he should receive from the underwriters for his so doing shares of the common capital stock of the proposed new company to the amount of $250,000.

The plaintiff contends that after the above-mentioned decision of the Circuit Court of Appeals it was in a position to require the defendant to prevent further manufacture by the competing companies of bearings with side filling slots; that this would have given the plaintiff a monopoly of the right under the Conrad patents to make, use, and sell bearings with side filling slots; that this right had become most valuable by reason of the aforesaid decision of the Circuit Court of Appeals; that the surrender of that right was a most improvident act from the standpoint of the plaintiff, and that the plaintiff, although having a more advantageous dealing position, did not acquire under the agreement of July 8, 1915, rights and advantages equal to those soon thereafter obtained from the Hess-Bright Manufacturing Company by the New Departure Manufacturing Company and other companies which had theretofore been manufacturing without a license; and that the failure to submit the proposed contract to the board of directors of the plaintiff, or to the court, and the improvidence of the contract, when viewed in the light of the subsequent refusal of the defendant to grant a license to the proposed reorganized company, unless it was made Woodward's nominee, sustain the allegations of fraud.

[1] Is this conclusion sound? The fact of nonsubmission of the proposed contract to the plaintiff's board of directors, or to the court appointing the receivers, can be relevant to the issue of fraud only as it tends to show secrecy in the making of such contract. But the contract was not made in secret. The advisability of making such a contract was discussed by Woodward and Bodine with the creditors' committee, representing more than 94 per cent. of the claims against the plaintiff; it was likewise under discussion with many stockholders and with at least 9 of the 12 directors of the plaintiff company. Was the contract an improvident one? The use of bearings with filling slots greatly exceeded the use of bearings without such slots. The bearings without slots command a higher price, and were used by the manufacturers of the more expensive automobiles. Expert testimony produced by the plaintiff and by the defendant differed upon the question as to which is the superior bearing. The plaintiff, in contending that after the decision in Hess-Bright Manufacturing Co. v. Fichtel the Standard Roller Bearing Company had or was in a position to have a complete monopoly in the manufacture of the type of bearing with side filling slots, overlooks the fact that the original license agreement did not prevent the licensor from manufacturing that type of bearing and selling it for such price as it saw fit, even though that price should be so far below the price at which the plaintiff was permitted to sell under the original agreement as to deprive the plaintiff of any or all benefits from the original license. Nor did the original license agreement prevent the licensor from granting to others a license to manufacture and sell the non-slot type of bearing upon such terms as to royalty and selling price as would likewise have made the original agreement to the Standard Roller Bearing Company of little or no value.

Again, there was some doubt in the minds of the receivers and their counsel as to whether the license to the Standard Roller Bearing Company, it containing a nonassignable clause, inured to the benefit of the receivers. The defendant was insisting that by reason of the cessation of importations of bearings, due to the war, it was essential that the output of bearings in the United States should not be curtailed by the decision of the Circuit Court of Appeals, and that to prevent this result it would be necessary for it to license some or all of the companies theretofore competing with the plaintiff. The defendant suggested that it, the licensor, could under the original agreement engage in the manufacture of side filling slot bearings and license other companies to manufacture the non-slot type, but that sound business policy, under the circumstances then existing, required that all licensees should be permitted to make bearings in any form covered by the patents. The plaintiff and the receivership estate were thereby brought face to face with a situation that called for the exercise of business judgment. Should they stand on the original agreement, or should they consent to a modification? Woodward did not attempt to decide unaided and alone the proper course to pursue. As hereinbefore said, he submitted the question to the creditors' committee; he discussed it with the stockholders and with practically all the active members of the board of directors. Counsel for the receivers advised that it was unnecessary to submit the question to the court. The consensus of opinion was that the second supplemental agreement should be made.

The soundness of this judgment was vindicated, at least so far as the receivership estate was concerned, by the fact that the receivers subsequently received approximately $30,000 in rebates of royalties under the terms of the new agreement that would not have been received by them under the original agreement. It appears that Woodward and Bodine, though disagreeing as to many of the receivership matters, were in accord as to the wisdom of making the contract in question. It is also worthy of note that Bodine, who as coreceiver participated in the negotiations for the contract and joined in its ratification as coreceiver, is not charged with fraud. But it is said by the plaintiff that, notwithstanding its more advantageous dealing position, the companies theretofore manufacturing the bearings without a license under the Conrad patents secured more advantageous license agreements. It is true that these licenses, or some of them, were granted "unto the said licensee, and unto only those of its successors and legal representatives who acquired or succeeded to the entire United States ball bearing business of said licensee," while the license to the Standard Roller Bearing Company was to that company only, and was not assignable. This difference is readily accounted for, however, by the difference in the financial condition between the Standard Roller Bearing Company and the other companies. On the other hand, the 20 per cent. rebate in royalties to the plaintiff must not be overlooked. The result is that I am unable to say from the evidence, particularly when the matter is viewed as of the date of the contract, rather than in the light of subsequent events, that the contract was an improvident one.

[2] A further circumstance, tending in the view of the plaintiff to prove fraud, is the situation disclosed by the following letter from the defendant to Woodward, viz:

"November 9, 1915.

"Mr. R. S. Woodward, Jr., Standard Roller Bearing Co., 50th & Lancaster Ave., Philadelphia—Dear Mr. Woodward: This is to confirm our oral communication to the effect that, if the Standard license lapses, it is our intention to grant to you or to your nominee, on the condition that you are permanently and actively connected with such nominee, a further license under the Conrad patent. Of course, the present license to the Standard Company is nonassignable and must die with that company, but our relations with you have been of such a satisfactory character as to induce us to recognize the personal element involved, and for that reason we are disposed to continue a license to you, or some concern with which you will be actively connected. Of course, the terms will not and cannot be better than those that have been lately granted to our more recent licensees.

"Yours very truly,          The Hess-Bright Manufacturing Company,
"FEB–TRC                                    [Signed]   Fred E. Bright, President."

This letter was written more than four months after the execution of the contract in question. The occasion for its being written was that Woodward had at about the date of the letter, and at the request of the reorganization committee, conferred with the defendant relative to the acquisition by the proposed new company of a license under the Conrad patents. There is no evidence that the granting of a license to Woodward or his nominee was ever in the mind of the defendant company at any time before such conference, that Woodward prior thereto was in any way aware that he could personally obtain such license, or that the offer to grant a license to Woodward or his nominee under the conditions mentioned was based upon reasons other than those stated in the letter; and there is no evidence from which such inferences may be justly drawn.

As I have heretofore found no secrecy in the making of the second supplemental agreement, and as I have been unable to find that that agreement was under the circumstances an improvident one, I am unable to find that the position of the defendant company. as disclosed by the foregoing letter, is inconsistent with bona fides in the making of the second supplemental agreement. Being unable to find any connection between the contract of July 8, 1915, and the letter of November 9, 1915, I am not convinced that the subsequent act of Woodward in endeavoring to obtain from the underwriters of the reorganized company a large amount of its capital stock, in consideration of his designating such company as his nominee to receive the license referred to in that letter, is enlightening upon the question of fraud in the making of the second supplemental agreement. The propriety or impropriety of such action on the part of the receiver, separate and apart from the issue of fraud, is, of course, not before me. Even the cumulative force of the separate matters adduced in support of the charge of fraud, and hereinbefore considered, is not sufficient to overcome the presumption that men are honest in their dealings. I therefore find that the charge of fraud has not been sustained.

Was the plaintiff, by reason of the receivership decrees, without power to make the agreement of July 8, 1915? The plaintiff claims

that it was without power to make that agreement, and bases its claim upon the contentions that the agreement is contrary to the terms of the injunction granted by the receivership decrees, and that the appointment of receivers for the plaintiff corporation was a suspension of its functions and authority over its property and effects. In considering these contentions it will be assumed, but without deciding, that one or both of the decrees applied to the original license agreement, although it was nonassignable, and that the contract was made in violation of the injunction.

[3] Did the injunction make the contract void as to the plaintiff? I find no well-settled doctrine that an act done in violation of an injunction is a complete nullity. On the contrary, the usual remedy for breach of an injunction is by proceedings against the offending party for an attachment for contempt, and where the violation has taken the form of a transference of the subject-matter of the litigation, creating an incumbrance against it, entering into a contract affecting it, or delivering possession of it to another, the person guilty of such violation may be required to restore the status to purge himself of the contempt. High on Injunctions, §§ 1449, 1461; Murphey v. Harker, 115 Ga. 77, 41 S. E. 585; Ashby v. Ashby, 62 N. J. Eq. 618, 50 Atl. 473. But the restoration in such cases is not to vindicate the authority of the court, but is for the benefit of the party at whose instance the injunction was granted. Declaring a contract made in violation of an injunction void, which is merely a means of restoring the status, is not for the protection of the court, and therefore required by public policy, but is for the benefit of the person injured by the forbidden act. Such a remedy is civil in its nature, and is obtained upon proceedings instituted by private individuals, and not by the court in the interest of the general public. Thompson v. Pennsylvania R. Co., 48 N. J. Eq. 105, 21 Atl. 182; Ashby v. Ashby, supra.

In Murray v. Lylburn, 2 Johns. Ch. (N. Y.) 441, and in Union Trust Co. v. Southern Nav. Co., 130 U. S. 565, 570–571, 9 Sup. Ct. 606, 32 L. Ed. 1043, acts had been done in violation of an injunction. The court in each case tested the validity of the act by the doctrine of lis pendens. The acts were thereby held void only at the election of the injured party. In fact Chancellor Kent in Murray v. Lylburn expressly gave to the injured party the option of having the sale declared void or of taking the proceeds of the sale. I find no case holding that an act done in violation of an injunction will be undone by the court upon the application of the wrongdoer. I think the true doctrine is that expressed in Greenwald v. Roberts, 4 Heisk. (Tenn.) 494, which in substance is that an act done in violation of an injunction may be held void upon the application of the party injured thereby, but that such act is valid as to the wrongdoer. I am of the opinion, therefore, that the injunction constitutes no basis for a decree in this cause adjudging the second supplemental agreement invalid.

[4] Did the appointment of receivers for the plaintiff corporation deprive the plaintiff of its power to make the contract in question? It is well settled that the appointment of a receiver of a corporation does not dissolve the corporate entity or terminate its legal existence. Chem-

ical National Bank v. Hartford Deposit Co., 161 U. S. 1, 16 Sup. Ct. 439, 40 L. Ed. 595; Du Pont v. Standard Arms Co., 9 Del. Ch. 315, 320, 81 Atl. 1089. This is true, even though the decree appointing the receivers also enjoins the corporation from exercising its powers and franchises. Kincaid v. Dwinelle, 59 N. Y. 548. The court in O. & M. Ry. Co. v. Russell, 115 Ill. 52, 57, 3 N. E. 561, 563, said:

"Notwithstanding the appointment of the receiver, the corporation is clothed with its franchises, and such corporation still exists. The effect of the appointment of the receiver is simply to give him the temporary management of the railroad, under the direction of the court, instead of the manager appointed by the directors of the corporation. It is that, and nothing more. As the corporation still exists, it may still exercise, as before, its franchises, so it does not interfere with the rightful management of the road by the receiver, so far as his duties are defined by the court appointing him."

To the same effect is Alderson on Receivers, pp. 505–509.

In Linn v. Dixon Crucible Co., 59 N. J. Law, 28, 30, 35 Atl. 2, it was held that, if the corporate existence remains unimpaired, the corporate powers continue to exist. The Court of Errors and Appeals of New Jersey, the state of the domicile of the plaintiff, in Rosenbaum v. U. S. Credit System Co., 61 N. J. Law, 543, 40 Atl. 591, said:

"The statutes nowhere provide that a mere adjudication of insolvency and appointment of a receiver shall take from the corporation its right to transact business. The practical effect of insolvency and receivership would probably be the stoppage of business, but the right to continue would not be taken away."

The necessary inference is that a statute is required to give to the appointment of a receiver the effect of depriving a corporation of its franchises. True, an injunction may operate upon the corporation and its officers, and render them liable to punishment for the exercise of certain corporate powers. Again, the appointment of a receiver for a corporation places its property in gremio legis (Alderson on Receivers, 199, 505–509), and the doctrine of lis pendens might be applicable in the event that any one should attempt after the appointment of a receiver to acquire property from the corporation (Tilton et al. v. Cofield et al., 93 U. S. 163; 23 L. Ed. 858). But this is far from saying that the corporation is stripped of its powers and franchises by the appointment of a chancery receiver. It merely says that the exercise of such powers may be hazardous, and that any acts of the corporation depleting or adversely affecting the receivership estate may be undone upon application of the proper party.

The plaintiff cites Gravenstine's Appeal, 49 Pa. 310, Treat v. Life Insurance Co., 199 Pa. 330, 49 Atl. 84, 85 Am. St. Rep. 788, and Linville v. Hadden & Co., 88 Md. 596, 41 Atl. 1097, 43 L. R. A. 222, in support of its contention that the appointment of receivers for it by the court of its domicile effected a suspension of its functions and authority over its property; but these cases do not state that their conclusion is based upon a finding that the appointment of a chancery receiver strips the corporation of its franchises and powers—the matter with which we are now concerned. The judgment in each of those cases may be based upon any one or more of the other theories heretofore mentioned. Consequently those cases are not necessarily inconsist-

ent with a finding that the corporate powers and franchises remain intact after the appointment of a receiver.

Furthermore, in the case at bar the act of the corporate officers in making the second supplemental agreement was not detrimental to the receivership estate. On the contrary, inasmuch as the license under the original agreement was nonassignable, the making of such supplemental agreement was probably the only way in which the value of the license to the receivership estate could be increased, and it was increased by such contract to the extent of approximately $30,000. The making of such supplemental agreement might therefore be said to be in strict conformity with the spirit of the receivership decrees, though in conflict with the letter thereof. It must also be noted that the receivership estate was closed and the receiver discharged without the contract having been set aside, without contempt proceedings having been instituted against the corporate officers executing the agreement, and that the person now asserting invalidity of the contract is the corporation itself. For the foregoing reasons I find that the receivership decrees did not deprive the plaintiff of its power to make the contract in question.

[5] The execution of the agreement of July 8, 1915, on behalf of the plaintiff by its corporate officers, was not antecedently authorized by it. Is the agreement for that reason not binding upon the plaintiff? The want of antecedent authority may be cured by subsequent ratification. Such ratification may be express or implied. No express ratification by the Standard Roller Bearing Company has been shown. Touching implied ratification it appears that more than a majority of its directors and the holders of probably a majority of its capital stock had knowledge of the facts from the time the contract was made. The defendant began operating under the agreement within a few days after it was made, and has since continued to operate under it. On August 11, 1916, a petition was filed by the creditors' committee in the District Court of the United States for the Eastern District of Pennsylvania in the cause in which the Standard Roller Bearing Company was defendant. A copy of the second supplemental agreement was one of the exhibits annexed to that petition. Subsequently certain stockholders filed a petition in said cause, attacking the validity of the agreement in question. The corporation remained silent. Pursuant to stipulation between the attorney for the receivers and the attorney for the petitioning stockholders, the stockholders' petition was dismissed by the court on March 5, 1917. Still the corporation remained silent. It continued to remain silent until after the sale of all its assets, and the receivership estate had been substantially closed.

Silence under such circumstances seems inconsistent with any theory other than that of ratification. But the corporation did more than remain silent. It, or its receivers, made bearings of the non-slot type. Rebates of royalty as provided for in the second supplemental agreement were made monthly by the defendant to the Pennsylvania receivers until the sale of the assets in February, 1917. The receivership estate was increased thereby to the extent of approximately $30,000. The corporation had the benefit thereof. Ratification is a matter of in-

tention, but an intention to ratify may be presumed from the conduct of the principal. Passive acquiescence, with knowledge for more than a reasonable time, under all the circumstances and particularly where the unauthorized act is beneficial to the principal, will operate as a ratification. Knowles v. Northern Texas Traction Co. (Tex. Civ. App.) 121 S. W. 232; United States Light & H. Co. v. J. B. N. Electric Co. (C. C.) 189 Fed. 382. I am of the opinion that in legal contemplation there was a ratification by the corporation at or before the date upon which the stockholders' petition was dismissed. This makes it unnecessary to consider events thereafter occurring.

In the view I have taken of the case it also becomes unnecessary to pass upon other theories upon which the defendant claims the contract may be sustained, or the plaintiff estopped from setting up its invalidity. It likewise becomes unnecessary to pass upon the motion to dismiss Brown Bros. & Co. as parties plaintiff.

The bill of complaint must be dismissed, with costs. A decree accordingly may be prepared and submitted.