O. H. GALL, *Receiver, et al. v.* WESLEY ALVIN COWELL *et al.*

(No. 8493)

Submitted February 2, 1937. Decided February 16, 1937.

264

*George R. Farmer,* for appellants.
*Frank Cox* and *Chauncey M. Price,* for appellees.

RILEY, JUDGE:

This is a suit in equity brought by C. E. Lawhead, the then receiver of the Bank of the Monongahela Valley against Wesley Alvin Cowell and Glenn Hunter for the purpose of having set aside a contract of sale of a certain judgment in favor of the said Lawhead and against Max DeLynn and Isaac A. DeLynn, brothers, entered on September 10, 1932, in the principal amount of $25,868.-53, which contract of sale was entered into on March 19,

1935, with the said Lawhead, receiver, as vendor and the defendant, Wesley Alvin Cowell, as vendee. During the course of the suit, the said C. E. Lawhead had resigned as receiver and O. H. Gall having been appointed in his place, he was substituted as a party plaintiff for the said Lawhead. On demurrer to the bill of complaint, a defect of parties plaintiff having been raised, the Bank of the Monongahela Valley was made a party plaintiff by order of the court. From a final decree in favor of the defendants, entered on June 22, 1936, the plaintiffs appeal.

The defendant, Glenn Hunter, is a lawyer who has practiced at the bar of Monongalia County for many years. He had been the attorney and a director for Union Bank & Trust Company, which bank, on August 2, 1930, by assignment, had transferred all of its assets to the Bank of the Monongahela Valley. At the time of this transfer, he had in his hands as such attorney for said Union Bank & Trust Company, several small items of business in the court of bankruptcy which he continued to have charge of on March 19, 1935, the date of the contract under consideration. The work of handling these items of business simply entailed Hunter's appearance on occasions at creditors' meetings in the Bankruptcy court and the payment of dividends to the receiver. On August 2, 1930, Hunter had been elected a director of the Bank of the Monongahela Valley and continued to serve in that capacity until the failure of said Monongahela Valley Bank on December 31, 1930, on which date the said C. E. Lawhead was appointed by the banking commissioner as the receiver of said bank. The record does not disclose the removal or resignation of the said Hunter. For the severance of his relationship as a director of the bank, he relies wholly upon its failure and the appointment of the receiver.

On March 19, 1935, the date of the contract in question, Hunter was indebted to the receiver of the Bank of Monongahela Valley in the amount of $19,546.46, subject to certain credits in the amount of $3,918.09. In addition to these credits, Hunter claimed an additional

credit for unpaid attorney's fees in the amount of about $4,000.00. Of the total indebtedness, all except $630.50, the balance of double liability on the stock owned by Hunter in the Bank of the Monongahela Valley, consisted of original indebtedness based on notes and double liability for stock owed to the Union Bank & Trust Company.

The judgment debtors, Max DeLynn and Isaac A. De-Lynn, owned an undivided one-half interest in three certain parcels of real estate situated in the City of Morgantown. For purposes of convenience, these parcels of real estate will be called the Woolworth property, the Standish building and the McNeill property. Of these parcels of real estate, the Woolworth property was by far the most valuable. It is with this parcel that this case is largely concerned. One Sampson Finn was the owner of the other undivided one-half interest in said three parcels of real estate.

The building on the Woolworth property was built by F. W. Woolworth Company and leased by the DeLynns and the said Sampson Finn to said company under a fifty year lease which began April 1, 1927, and will expire March 31, 1977. This lease contains various provisions as to insurance and other matters which do not enter into this suit. The rent reserved in the lease for the first ten years was $10,000.00 per year and the lease provided for an increase in rent at the rate of $2,000.00 every ten years' period during the course of the lease. By agreement between the lessor and lessees, the rentals were reduced under the lease by a sum of $500.00 per year for the first three ten-year periods. In 1924, the De-Lynns and Finn executed a deed of trust in favor of the Fidelity Trust Company of Pittsburgh on the Woolworth property to secure the sum of $50,000.00, the principal of which indebtedness as of March 19, 1935, was in the amount of $40,000.00; and in 1930, the same parties executed a deed of trust on the Standish property (improved), to secure a loan of $50,000.00, from the aforesaid company. Approximately $44,000.00 of the latter loan remains unpaid.

On November 22, 1927, by an assignment duly recorded, the DeLynns assigned all their interests in the rents under the Woolworth lease to Bankers Trust Company of Philadelphia to secure the payment of an indebtedness in the amount of $46,000.00 with the provision that upon the repayment of said sum, said rentals shall revert to the lessees. The DeLynns' share of the rentals under the Woolworth lease ranged from $5,000.-00 per year up to $9,000.00 per year.

At the time of the appointment of the receiver for the bank, the DeLynns were also indebted to the bank in the amount of about $25,000.00. The foregoing included a $15,000.00 and a $10,000.00 loan made early in 1930, a deed of trust having been given on the Woolworth property to secure the former, and on the Standish, to secure the latter. This indebtedness was reduced to a judgment in favor of the receiver in the amount of $25,868.53, by judgment order entered on September 10, 1932. This judgment was later secured by an assignment to the receiver of the Bank of the Monongahela Valley of the Woolworth rents, dated January 31, 1933, which assignment, of course, was subject to the previous assignment made to the Bankers Trust Company.

Sampson Finn, the DeLynns' co-tenant, was financially sound and, as the record disclosed, was prompt in the payment of his obligations. However, the DeLynn brothers were unable to comply strictly with the terms of their contract to the Fidelity Trust Company, and, during the course of two years, had been delinquent in the payment of their interest. It was because of Finn's financial worth and responsibility that the Fidelity Trust Company had extended the original time of payment upon its loan on the Woolworth property from December 16, 1929, to December 16, 1934, without requiring any deductions of principal and had, at least through one of its officers, consented to the assignment to the Bankers Trust Company.

At one time, Hunter made an effort personally to purchase for himself the DeLynn judgment and later, that is, in March, 1933, as the attorney for Finn, he again

tried to purchase this judgment and made an offer of $9,500.00, but the receiver refused to take less than $10,-000.00. The price of $10,000.00 was determined by the receiver, Lawhead, with the approval of the banking commissioner and, as Lawhead himself testified, this sum of $10,000.00 was the purchase price for the judgment from the very date the judgment was entered, and was regarded by the receiver as a fair and reasonable price for said judgment. The approval of the banking commissioner was given in May, 1933. After the receiver refused to accept the Finn offer of $9,500.00, Finn, for some unexplained reason, withdrew as a possible purchaser.

For some time prior to March 19, 1935, that is, as early as 1930, the defendant Hunter had been an attorney for the Fidelity Trust Company. He had not been employed generally by said company and he did not have authority to represent it in all matters. He had, however, from time to time, been consulted on legal questions by the company, acting through one R. R. Cappe of Pittsburgh, who was the head of the real estate department of the Fidelity Trust Company, though not a member of its board of directors. At intervals, Cappe used Hunter's office for the purpose of consulting with Morgantown debtors. Cappe consulted him for the purpose of having a foreclosure of the Fidelity Trust Company's deed of trust in order to eliminate the assignment of rents to the Bankers Trust Company. On this occasion, however, Hunter was informed by Cappe that the company was unwilling to foreclose at that time for two reasons: first, that to do so would embarrass Sampson Finn who had been regular in his payments, and second, that a subordinate officer of the Fidelity Trust Company had verbally assented to the assignment of rents to the Bankers Trust Company, and that the president of his client company felt that there was a moral obligation to let the matter stand until the Bankers Trust Company was paid out, or, at least, until December 16, 1934, the date of the expiration of the five-year extension of the deed of trust. Hunter had been specifically authorized to pro-

tect the interests of the Fidelity Trust Company by preventing the diversion of the rents on the Woolworth property to the payment of any indebtedness subsequent to that owed the Fidelity Trust Company. However, he had no authority to represent the company generally in the DeLynn matter, and he was not authorized to foreclose the DeLynn deed of trust.

On December 21, 1934, a meeting was held in the defendant Hunter's law office in Morgantown, at the instance of the said Cappe, at which meeting Finn, the DeLynn brothers and Hunter were present. At this time, the DeLynns were delinquent in the payment of interest, the item of interest then being due amounting to $600.-00. This interest was not fully made good until in February, 1935. At this meeting, according to the testimony of Max DeLynn, Finn told Cappe that the indebtedness to the Bankers Trust Company was about $9,000.00. DeLynn then discussed with Cappe about trying to raise funds through Cappe for the satisfaction of the indebtedness of the Bankers Trust Company and the receiver of the Bank of the Monongahela Valley. However, Cappe said that his company would not consider a lien on a one-half interest in real estate. It then appears from the testimony of Max DeLynn that Cappe told the DeLynns that he would recommend to his company their proposition, whereby one-half of the DeLynn income, that is to say, $2,500.00 a year, would be applied to the indebtedness due to the Fidelity Trust Company and the remaining one-half to new indebtedness in the event the DeLynns were able to bring about a refinancing of subsequent liens. At this meeting, Cappe made no demand for payment of the principal according to the testimony of both DeLynn and Finn. Cappe and Hunter, however, testified that Cappe made a verbal demand for payment. On February first, following the December meeting in Hunter's office, the financial committee of the Fidelity Trust Company entered an order withholding any action on the Finn and DeLynn debt while taxes on the property and interest on the indebtedness were being paid. Cappe and Hunter testified that Hunter did not know of this arrangement.

In February, 1935, the defendant, Hunter, conferred with one Daniel S. Blackman as to the purchase of the judgment which the receiver had against the DeLynns. Blackman was a resident of Philadelphia, who for about one year had been in Morgantown, at least on occasions, and had negotiated with the receiver, Lawhead, looking toward the purchase and sale of all of the assets of the Bank of the Monongahela Valley. For some reason or other, not disclosed by the record, these negotiations as to the entire assets of the bank failed. Blackman had also negotiated with the receiver on several occasions for the purchase of parts of the assets of the bank. The record discloses that Blackman and the receiver, Lawhead, mutually had complete confidence in each other, and that Lawhead and Hunter also had confidence in one another. This being the situation, an arrangement was entered into between the defendant Hunter and the said Blackman, whereby the latter was employed as a negotiator to negotiate with the receiver for the purchase of the indebtedness due the receiver from the DeLynns, including the judgment in question, and he was authorized by Hunter to pay $10,000.00 as the purchase price. It was understood between Hunter and Blackman that Blackman was to carry on the negotiations not as the agent of Hunter, but in his own name. The sale was to be consummated without disclosing that Hunter was the real party in interest. This arrangement was entered into, so Blackman testified, because it was thought by the two parties that a better price could be obtained by someone living outside of Morgantown. It was understood that Hunter was to furnish all of the money and that any profits realized from the venture should be divided on the ratio of two-thirds to Hunter and one-third to Blackman. This arrangement having been made, Blackman then had a preliminary meeting with Lawhead. Then again on March 4, 1935, another meeting was had with Lawhead in Clarksburg. Early in the month of March, 1935, and prior to March 11, 1935, according to the testimony of Lawhead, the contract for the purchase of the DeLynn indebtedness was verbally entered into between

Blackman and the receiver and was finally closed verbally at which time Blackman paid to the receiver the sum of $1,000.00 on account of the $10,000.00 purchase price.

The first meeting between Blackman and Lawhead occurred at Clarksburg during the latter half of February, 1935. At this meeting, according to Lawhead's testimony, or at a following meeting, Blackman told Lawhead that he had been informed by the defendant, Glenn Hunter, attorney for the Fidelity Trust Company, that the DeLynn loan from that company was delinquent, in an unsatisfactory state, and threatened with foreclosure.

At the time the negotiations were going on between Blackman and the receiver, leading toward the purchase of the DeLynn judgment, the receiver labored under the impression that the indebtedness due from the DeLynn brothers to the Bankers Trust Company of Philadelphia was about $23,000.00. During the course of the negotiations, Lawhead told Blackman that he would not close the deal until he had learned two things: first, the amount due the Bankers Trust Company, which all parties evidently thought was around $23,000.00, and second, the attitude of the Fidelity Trust Company toward the enforcement of its claim against the DeLynns, and he requested Blackman that a letter be secured from Hunter as to the attitude of the Fidelity Trust Company. Lawhead then called by telephone the Bankers Trust Company in the presence of Blackman and found the debt due from the DeLynns to be $7,900.00 instead of about $23,000.00. He then refused to sell the judgment on the basis of $10,000.00. After this conference, Blackman went back to Morgantown to obtain a letter from Hunter as to the attitude of the Fidelity Trust Company.

By letter dated March 6, 1935, Hunter wrote to Lawhead, informing him that the DeLynn mortgages on the Woolworth and Standish properties were in default as to principal, and that the Standish building was in default as to interest. In this letter, he wrote: "* * * I do represent the Fidelity Trust Company, and have been instructed to protect the interest of the Fidelity Trust Company in both of the mortgages held by it."

Under date of March 11, 1935, the defendant, Glenn Hunter, wrote a letter to the receiver, Lawhead, in accordance with Lawhead's request. Before this letter was sent, the defendant, Glenn Hunter, called the Fidelity Trust Company's real estate agent, Cappe, by telephone, which call was made in the presence of Blackman who heard Hunter's conversation at one end of the line. From Blackman's testimony, it cannot be determined definitely what was the full purport of the telephone conversation between Hunter and Cappe.

Hunter's letter of March 11, 1935, in substance, informed the receiver that he was representing Blackman in the matter of the purchase of the DeLynn judgment so long as there was no conflict with the interests of the Fidelity Trust Company; that the Fidelity Trust Company's mortgage, in the amount of $40,000.00, was in default; that the debt due from the DeLynns to the Bankers Trust Company was about $7,900.00 instead of about $23,000.00; and that when the DeLynn mortgage became in default a few months ago, he (Hunter) made some investigation of the situation and advised the Fidelity Trust Company that it could divest any rights of the Bankers Trust Company by foreclosure of its mortgage. In this letter, Hunter also said:

> "It developed, however, on further checking, that someone in the Trust Company had given verbal assent to the assignment of the rentals to the Bankers Trust Company, and that the Trust Company therefore thought it was obligated, not legally but morally, to let the matter stand. Since then, the default has become more aggravated. Now it appears from Mr. Blackman's statement to me, that at the expiration of the assignment of rentals to the Bankers Trust Company, you as receiver of the Bank of the Monongahela Valley, will expect to take the rentals under your assignment above referred to.
>
> "I saw at once that this affects in a very vital way, the interest of the Fidelity Trust Company, so I called the company this morning, drawing its attention to the situation. The attitude of the Trust Company is always very

friendly and considerate in matters of this kind, both as to delinquent debtors and other creditors who chance to be interested in the same persons and property; but I am authorized to say to you that the Trust Company will not permit a further diversion of DeLynns' interest in these rentals from the underlying mortgage, than has already taken place, and will resist in every proper and legal way the application of the rentals to your judgment or to any other debt junior to its mortgage. The Trust Company feels, and I have so advised it, that it could divest your judgment by foreclosure of the mortgage, and that that would eliminate any question of the rentals under your assignment. Of course, if you should be interested in paying off the Fidelity Trust Company, that would work a solution of the matter insofar as it is concerned.

"In view of the fact that the question of priority of the assignment of rentals to you over the Fidelity Trust Company's mortgage has been raised at this time, it may as well be determined now, as there would be no point in letting the default in the mortgage drag along for another two years, until the Bankers Trust Company has been paid, and then possibly find that some outside person claims subrogation under that assignment, and also be confronted with a claim on your part, under your assignment; therefore, we would be glad if you would have an examination made of the legal questions involved, by your counsel, and if upon such examination there is a disagreement as to the legal effect of the assignment, then the proper proceedings to determine the question may as well be started now."

The letter near its close also contains the following paragraph:

"If you would like to have firsthand information with regard to the Trust Company's attitude in this matter, you may call or write Mr. R. R. Cappe, Real Estate Department, Fidelity Trust Company, Pittsburgh, Pennsylvania."

Mr. George R. Farmer, a lawyer, practicing at

Morgantown, and the attorney for the appellants, was the attorney for the receiver, Lawhead, during the time of all the negotiations leading up to the execution of the contract of March 19, 1935. However, during the earlier negotiations between Lawhead and Blackman, Mr. Farmer was confined to the hospital and did not return until about March 11, 1935.

The contract in question was closed on March 19, 1935, in Farmer's office. There were present at the meeting Mr. Lawhead, his attorney, Mr. Farmer, Mr. Hunter and Mr. Blackman. The contract itself was written or at least re-written by Hunter after consulting with and having suggestions from Farmer, the attorney for the receiver. The contract was wholly typewritten except a short clause, providing that at the request of the receiver, the vendee will enforce the judgment at any time during the period of five years. The name of the purchaser and the date of the instrument were both left in blank. At the time the contract was signed and executed, the date, March 19, 1935, was inserted in it as well as the name of the purchaser, the defendant, Wesley Alvin Cowell.

At this meeting in Farmer's office on March 19, 1935, a discussion arose as to whose name should be inserted as the purchaser, Blackman having previously advised the receiver that he had decided to use the name of a Miss Esther George, of Philadelphia. After some discussion, it was decided that it would be inadvisable to use Miss George's name as she was Blackman's secretary. Then Hunter's name was suggested as Blackman's attorney. This suggestion brought 'an objection from Farmer which was concurred in by Lawhead. It might be added that during the course of the discussions between Farmer and Hunter, as the contract was being prepared, nothing was said for or against Hunter's becoming the purchaser of the judgment. Hunter testified that Farmer did not object and did not raise any question on the ground that the contract itself, as written, was assignable. Finally, after some discussion, Blackman suggested the defendant, Wesley Alvin Cowell, a resident of New Jersey, who was engaged as a handy man for Blackman, and kept his horses.

The defendant, Cowell, was unknown both personally and by reputation to the receiver, Lawhead. He was a man of little or no financial worth, his total worth being, according to Blackman's testimony, between $500.00 and $1,000.00. At the time of the execution of the contract on March 19, 1935, the defendant, Cowell, was not present, and the contract was not signed by him at that time. His signature was affixed to the contract at a later time and then the contract, fully executed, was turned over to the receiver, Lawhead.

The contract in question provides for the payment of $7,500.00, the residue of the $10,000.00 consideration, in two installments, the first in the amount of $2,500.00, ninety days from date, and the second in the amount of $5,000.00, one hundred twenty days from date, with interest on the deferred installments at the rate of 6% per annum and with the right to anticipate the payments. This contract embraces the said judgment of the Bank of the Monongahela Valley against the DeLynns, a deed of trust of the DeLynns to James R. Moreland, Trustee, on the Standish building in the amount of $15,000.00, a deed of trust of the DeLynns to said trustee on the McNeill property in the amount of $10,000.00 and the assignment of the DeLynns to the Bank of the Monongahela Valley and C. E. Lawhead, its receiver, of the rents under the Woolworth lease. The said two deeds of trust embraced in the contract represent the same indebtedness upon which the judgment was based.

Having ascertained through the telephone conversation with the Bankers Trust Company that this company's indebtedness was only $7,900.00 instead of $23,000.00, the receiver insisted that a clause be inserted in the contract to the effect that in the event the Woolworth building should be sold under the deed of trust at a price less than enough to pay the liens, senior to the lien judgment, the principal of said judgment with interest, the costs incurred in the action in which the judgment was recovered and the cost of any suit for the enforcement of the judgment, leaving an unpaid balance of said judgment as a lien upon the DeLynn real estate, other than

the Woolworth building, then any balance over the satisfaction of the aforesaid liens and judgment, derived from the real estate of the DeLynns, other than the Woolworth property, shall be paid to the receiver, Lawhead. Counsel for the appellants and appellees have taken opposite positions as to this provision of the contract. Counsel differ as to whether or not the contract, with this provision included, provides for the assignment of a judgment or simply for a participation in a judgment. This question has been raised in opposition to the effort of appellees to obtain specific performance of the contract. However, the question is moot, in view of the holding as hereinafter set forth in this opinion.

Under date of April 30, 1935, the receiver wrote a letter to Blackman in answer to Blackman's letter of April 26, 1935, in which he stated that he was "having Mr. Farmer prepare absolute assignment of the judgment to Mr. Glenn Hunter, as per your direction, and will deliver same upon receipt of the $2500.00." Lawhead testified that this statement in the letter as to the assignment to Hunter was an error in dictation, and that the letter should have read "to Wesley Alvin Cowell."

At a conference during the course of the negotiations between Blackman and Lawhead held late in February or early in March, Blackman told Lawhead that he had been informed by Mr. Glenn Hunter, attorney for the Fidelity Trust Company, that the loan was delinquent and in an unsatisfactory state, and was threatened with foreclosure. Blackman himself testified that "Mr. Lawhead was of the opinion that if the Fidelity was going to foreclose its mortgage, that his judgment, in the premises would be without value."

After the contract was executed, the receiver learned that Hunter, and not Blackman, was the real party in interest and that the Fidelity Trust Company, acting through its financial committee, had entered an order withholding indefinitely further action on the DeLynn loan. Neither of these matters had been disclosed to Lawhead by Hunter or Blackman in correspondence, or during the course of the negotiations leading up to the con-

tract. When Lawhead heard of these matters, he consulted with Hunter and requested that the contract be cancelled, and tendered to Hunter a refund of the $2,500.00, representing the initial payment under the contract, which tender was refused. In turn, Hunter tendered to Lawhead the balance of the purchase price, which tender was also refused, after which occurrences, this suit was brought.

Upon an examination, we find that the trial court properly overruled the demurrers to the original and supplemental bills of complaint.

The first question which confronts the court is the legal effect of the relationship which existed between Hunter and the receiver when the contract was made. It is true that the bank had been closed by the banking commissioner, and that Lawhead had been appointed and qualified as its receiver. Did this situation destroy the entity and franchise of the Monongahela Valley Bank and did it automatically result in the removal of Hunter as one of its directors? We think not. Even in the absence of statute, it has been almost uniformly held by the courts that a corporation does not lose its existence as a corporation merely by the appointment of a receiver. 16 Fletcher Ency. of Corporations, section 7773, Note 1; *Standard Roller Bearing Co.* v. *Hess-Bright Mfg. Co.,* 275 Fed. 916; 264 Fed. 516; *Union Petroleum Co.* v. *Indian Petroleum Co.,* 192 Iowa 1373, 186 N. W. 439; *Northern Pacific Railway Co.* v. *Frank Waterhouse & Co.,* 279 Fed. 750; *City of Montpelier* v. *National Surety Co.,* 97 Vt. 111, 122 A. 484, 33 A. L. R. 489; *Barthen* v. *Lodi Corp.,* 94 N. J. Eq. 177, 119 A. 189, 190; *Pinchback* v. *Bessemer Min. & Mfg. Co.,* 137 N. C. 171, 49 S. E. 106. The corporation remaining in existence after the appointment of a receiver, it follows that its directors, unless removed for some valid cause other than the mere appointment of the receiver, continue to remain in office, though their powers have been materially diminished by the appointment of the receiver. This is particularly true under chapters 5 and 7 of the Acts of the West Virginia Legislature, First Extraordinary Session of 1933 (sections

3224 [1] and [2], Michie's Code, 1933 Supplement), providing that the board of directors are a necessary part of the machinery for the reorganization of a closed bank after the appointment of a receiver by the banking commissioner. Under these West Virginia statutes, in the case of reorganization, the assets of the bank are turned over to the board of directors and the assets appraised by a board of appraisers, which includes a representative of the bank appointed by its board of directors. It follows that Hunter never having resigned, as shown by the record, was a director during the course of negotiations leading up to the execution of the contract.

It has been said that the relationship between directors and stockholders of a corporation is that of trustee and cestui que trust. However, under the great weight of authority in the United States, this relationship does not prevent a director, acting in good faith, from entering into a valid contract with the stockholders of the corporation, or with the corporation itself. III Fletcher, Cyclopedia Corporations, sec. 931; *Princeton Power Co.* v. *Hardy,* 103 W. Va. 329, 137 S. E. 362; *Griffith* v. *Blackwater Boom & Lumber Co.,* 55 W. Va. 604, 48 S. E. 442, 69 L. R. A. 124; *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 23 L. Ed. 328; *Deford* v. *Ballentine Realty Co.,* 164 Va. 436, 180 S. E. 164; *Fort Payne Rolling Mill Co.* v. *Hill,* 174 Mass. 224, 54 N. E. 532; 29 Columbia Law Review 338. However, in cases in which receivership has not intervened, directors hold a fiduciary relationship to the stockholders of a corporation, and a contract between a director and a stockholder of a corporation is subject to jealous scrutiny by the court. *Janney* v. *Minneapolis Industrial Exposition,* 79 Minn. 488, 82 N. W. 984, 50 L. R. A. 273; *Twin-Lick Oil Co.* v. *Marbury, supra; Poole* v. *Camden,* 79 W. Va. 310, 92 S. E. 454, L. R. A. 1917E, 988; Fletcher Cyclopedia Corporations, *supra; Wickersham* v. *Crittenden,* 93 Cal. 17, 28 P. 788. This is particularly true of bank directors. 4 Zollman, Banks & Banking, page 1.

The receiver of an insolvent bank represents both its stockholders and depositors. 16 Fletcher Cyclopedia

Corporations, sec. 7810. Thus, when a director of a closed bank contracts with its receiver, he is dealing with the representative of the bank's stockholders and depositors. In sound logic, the same fiduciary relationship exists between such director and the receiver as is found between a director of a bank and its stockholders. Any other position is unsound as a matter of public policy, because a receiver of a closed bank necessarily stands in the place of its stockholders. In some cases, he is not familiar with all the affairs of the bank. Certainly, his familiarity is not as deep and well grounded as that of a director, whose duty it was, prior to the receivership, to attend the meetings of its board of directors. It is reasonable for a receiver to expect that the members of the bank's board of directors, who, prior to his appointment, had conducted the bank's affairs, should continue in their loyalty to the best interests of the bank, its stockholders and depositors, having in view the successful payment of its depositors' claims and the protection of its stockholders in case of the bank's liquidation or its reorganization under the sections of the Code to which reference has been made.

Thus, when Hunter dealt with the receiver, he was dealing, in fact, with the representative of the stockholders and depositors. A fiduciary relationship clearly lay between them. He was a director of the bank. When the contract was made, he was the attorney for the receiver in several matters of a minor nature growing out of the affairs of the Union Bank & Trust Company. Negotiations were pending leading toward settlement of Hunter's indebtedness to the bank. Both parties had mutual confidence in each other. Under all the circumstances, it was entirely natural for Lawhead to place in Hunter a confidence which of itself created a fiduciary relationship between the parties. 2 Pomeroy, Eq. Juris. (3rd Ed.), sec. 956.

It follows from the situation of the parties that Hunter, in the negotiations leading toward the execution of the contract, was bound to use the utmost good faith. *Twin-Lick Oil Co.* v. *Marbury, supra*, 587, 590; *Poole* v. *Camden, supra*. By the very nature of his situation, he was bound

not to mislead. He should have known, as a matter of fact, that any representations made by him would be relied upon readily by the receiver. Such a reliance was simply a natural outcome of the very situation existing between the parties during the whole course of the negotiations. Notwithstanding this, he actually represented that he was the attorney for Blackman and not the real party in interest. In truth and fact, at the time this representation was made, Blackman was not Hunter's client. On the contrary, he was Hunter's agent. It may be that Lawhead was not particularly interested as to who would become the assignee of the judgment under the contract. The fact of Hunter's interest is not a very material matter in itself. It becomes material in the face of the fiduciary relations between the parties. He was not in a position to remain silent; yet, he not only failed to disclose his real interest, but by actual representation, he diverted Lawhead's mind from any thought that he, and not Blackman, was the real party in interest. Ordinarily, it is not the duty of a party to a contract to disclose his interest. Hunter, however, found himself in a situation that, in equity and good conscience, made his misrepresentation as to his interest a material one which placed upon him the duty, in the exercise of the utmost good faith, to give disclosure of all the facts.

The decision in this case does not require us to say that in every contract made between a director of a closed bank and its receiver, fraud will be presumed. We do not so hold. Such contracts, however, by reason of the situation of the parties and the fiduciary relationship which exists between them, imposes upon this court the duty to carefully scrutinize the contract and the negotiations leading up to it. Such being the case, Hunter's dealings with the receiver will not stand up under this scrutiny.

Hunter represented himself to be the attorney for the Fidelity Trust Company for all purposes in the protection of the interests of that company under the DeLynn deed of trust. By his representation, he of himself, placed himself in a position where he knew, or should have known, exactly the attitude of that company toward the

enforcement of its lien. The record does not disclose that Hunter had knowledge of the action of the finance committee of the Fidelity Trust Company on February 21, 1935, providing for the withholding of further proceedings in the enforcement of the lien for an indefinite period. But Hunter spoke as though he had full and actual knowledge. A representation made by him as to the company's attitude under these circumstances must, in good conscience, be made only at his peril. It is true that he said that the attitude of the company was friendly, but expressly through the representations of his agent, Blackman, and at least inferentially, in his letter of March 11, 1935, he represented to Lawhead that the threat of foreclosure at the hands of the Fidelity Trust Company impended. Because Lawhead knew, as he should, that the foreclosure of the Fidelity Trust Company deed of trust would render the DeLynn judgment substantially worthless, his misrepresentations as to the attitude of the Fidelity Trust Company became material. They were made by Hunter as though he was speaking of his own knowledge, therefore, it matters not whether he knew the repersentations to be true or false. The law imposed upon him the duty of knowing the exact situation. He is held to the same liability as though he knew the attitude of the Fidelity Trust Company and misrepresented that attitude. Time and again, this court, in repeated decisions, has held that misrepresentations made by one party to a contract as of one's own knowledge, intended to be relied upon by the other party, whereas, the first party was not informed as to the truth or falsity of the representations, is fraudulent in equity, even in the absence of actual fraud. *Dickinson* v. *Chesapeake & Ohio Railroad Co.*, 7 W. Va. 390; *Crislip, Guardian, etc.*, v. *Cain*, 19 W. Va. 438; *Tolley* v. *Poteet*, 62 W. Va. 231, 57 S. E. 811; *James* v. *Piggott et al.*, 70 W. Va. 435, 74 S. E. 667; *Stout* v. *Martin et al.*, 87 W. Va. 1, 104 S. E. 157; *Horton* v. *Tyree*, 104 W. Va. 238, 139 S. E. 737.

Lawhead was under no duty to make an independent investigation of the Fidelity Trust Company's attitude.

He had the right to rely upon Hunter's representations. He made no such investigation, though he could have done so as suggested in the letter of March 11, 1935. In numerous decisions, this court has held that one to whom a representation has been made as an inducement to enter into a contract has the right to rely upon it as true, and need not make inquiry or investigation to determine the truth thereof. *Staker* v. *Reese*, 82 W. Va. 764, 97 S. E. 641; *Kimmell* v. *Twigg*, 88 W. Va. 531, 536, 107 S. E. 206; *McBee* v. *Deusenberry*, 99 W. Va. 176, 128 S. E. 378; *Horton* v. *Tyree, supra.*

The record clearly shows that the representations that Hunter was not the real party in interest and his representations as to the attitude of the Fidelity Trust Company were made for the purpose of inducing Lawhead to enter into the contract. Lawhead actually did rely upon these representations. He testified he would not have entered into the contract if he had known that Hunter was the real party in interest. He required, as a condition precedent to his entry into the contract, definite knowledge as to the exact attitude of the Fidelity Trust Company; and the letter of March 11, 1935, was discussed between Lawhead and his attorney, Farmer, in a separate room in Farmer's offices just before the contract was actually executed. Even an innocent misrepresentation of a material fact for the purpose of having the other party rely upon it, will make a contract voidable. 3 Williston on Contracts, section 1500; Restatement of the Law of Contracts, section 476 (1). Of course, where the representation is honest, the parties must be placed in status quo at least as nearly as possible. Restatement of the Law of Contracts, section 480 (1). It would be a simple matter for the receiver to place Hunter in his former situation. He had already attempted to do this by the tender of the $2,500.00 initially paid under the contract. We think that the lower court erred. Its finding is against the preponderance of the evidence. In so holding, we have kept in mind the relationship which existed between Hunter and Lawhead at the time the contract was executed; and without holding that there was any

intentional fraud on the part of Hunter, it seems clear to us that his actions and representations leading up to the execution of the contract, viewed in the light of the relationship which actually existed between him and Lawhead, charged the whole transaction with constructive fraud, and the receiver has the right to have the contract voided upon the return to Hunter of the $2,500.00 initially paid.

We are therefore of the opinion to reverse the decree of the trial chancellor and remand the cause for further proceedings in accordance with this opinion.

*Reversed and remanded.*